```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

RICHARD ROSARIO,                    :

              Petitioner,           :   05 Civ. 8072 (PKC)(HBP)

   -against-                        :   REPORT AND
                                        RECOMMENDATION
ROBERT ERCOLE, Superintendent of    :
Green Haven Correctional Facility
                                    :

              Respondent.           :

----------------------------------X
```

PITMAN, United States Magistrate Judge:

TO THE HONORABLE P. KEVIN CASTEL, United States District Judge,

I.   Introduction

Petitioner Richard Rosario seeks, by his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an Order vacating a judgment of conviction entered on November 23, 1998 after a jury trial in the Supreme Court of the State of New York, Bronx County (Fisch, J.), for one count of murder in the second degree in violation of New York Penal Law Section 125.25. By that judgment, petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life and is currently incarcerated pursuant to the judgment.

Petitioner asserts four claims in his petition:  (1) that petitioner was denied his Sixth Amendment right to the effective assistance of counsel, (2) that the Trial Court erred when it failed to find that petitioner had made out a prima facie case of discrimination under Batson v. Kentucky, 476 U.S. 79 (1986), (3) that the Trial Court deprived petitioner of his due process right to a fair trial by erroneously admitting extrinsic evidence of petitioner's prior incarceration, and (4) that petitioner is actually innocent of the crime for which he has been convicted.  (Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus ("Pet. Mem.") at 2-3).

For the reasons set forth below, I respectfully recommend that the petition be conditionally granted with respect to petitioner's Batson claim and denied in all other respects.

II.  Background

   A.   Facts Leading to
         Petitioner's Conviction

      1.   The Prosecution's Case

Early in the afternoon on June 19, 1996 petitioner shot George Collazo in the head on Turnbull Avenue in Bronx County, New York, fatally injuring him (Trial Tr.[1] at 19).  There were at

---

[1]"Trial Tr." refers to the transcript of petitioner's trial.

2

least three eyewitnesses to the incident:  Michael Sanchez, Collazo's friend; Robert Davis, a porter who was working in the vicinity of the shooting when it occurred; and Jose Diaz, a food vendor who was also working in the vicinity of the shooting that day (Trial Tr. at 54-56, 133-67, 286-94).

Sanchez testified at trial that he and Collazo were walking on White Plains Road when they passed two males, one of whom Sanchez described at trial as a tall, thin Hispanic male with a fade haircut and a moustache; Sanchez described the other male as black (Trial Tr. at 139-47).  Sanchez testified that after he and Collazo passed the two men, Collazo stated "why do these niggers always have to front" (Trial Tr. at 141).  An argument ensued between Collazo and the Hispanic male, during which Sanchez stood approximately two feet from the Hispanic male and had an unobstructed view of the Hispanic male's face (Trial Tr. at 145, 149-50).  After about a minute of arguing, Collazo and Sanchez walked away, continuing down White Plains Road and then turning on to Turnbull Avenue (Trial Tr. at 150, 190).

According to Sanchez, while he and Collazo were walking on Turnbull Avenue, the Hispanic male, with whom Collazo had just argued, approached them from behind and said something to get their attention (Tral Tr. at 153).  When Sanchez turned around, the male was pointing a chrome revolver at Collazo; he then fired a single shot that hit Collazo in the head and ran away (Trial

3

Tr. at 152-55).  Sanchez ran after the shooter for a short distance, but then returned to the scene and yelled to nearby workers to call the police (Trial Tr. at 156).  Sanchez testified that he had no doubt that petitioner was the shooter both when he identified petitioner in a lineup almost three weeks after the shooting and when he identified petitioner at trial (Trial Tr. at 165).

On the day of the murder, Robert Davis, a porter, was working on Turnball Avenue when he heard someone say, "You won't do this anymore" (Trial Tr. at 53-56).  Davis then saw three men walking towards him when one shot another in the head and ran (Trial Tr. at 56-57).  Davis testified that he was able to see the faces of the three men, none of whom he had ever seen before and who were approximately two car lengths away from him at the time.  Although it had started to drizzle, Davis had an unob-structed view of the incident (Trial Tr. at 58).

Davis reviewed "mug books" at the police precinct on the day of the shooting, but could not then identify the shooter (Trial Tr. at 80).  Later that day detectives went to Davis' place of work with additional photographs.  Davis believes he looked at 50 to 75 more photos before he identified petitioner's (Trial Tr. at 86).  Davis testified that the officers and detec-tives who presented the photographs to him did not tell him that he had to select a photograph, and the photograph he selected was

4

not marked (Trial Tr. at 85-86).  Davis also testified that after he selected petitioner's photograph, he never saw the photo again (Trial Tr. at 88).  Davis testified that when he recognized petitioner in a lineup on July 9 and in court, he had no doubt that petitioner was the shooter (Trial Tr. at 66).

Jose Diaz, a food vendor operating a hot dog truck on the day of the shooting, witnessed the argument between Collazo and the other two males, which he believed lasted about ten minutes; Diaz witnessed the argument from approximately twenty-eight feet away (Trial Tr. at 292-93).  Diaz testified that after the argument, the males walked in separate directions, but one of the males with dark skin ran down the street.  Diaz did not see the shooting, but heard the shot (Trial Tr. at 295).  Diaz testified that he might be able to recognize the men he saw arguing that day, but did not identify petitioner in the court-room (Trial Tr. at 295).

Detective Martinez of the 43rd precinct testified that he interviewed both Sanchez and Davis the day of the shooting, and that while the men were in the precinct they were separated from each other so that they could not discuss the incident (Trial Tr. at 116).  Detective Martinez also testified that when Diaz and Sanchez viewed a lineup on July 9 that included the petitioner, they were not permitted to speak to each other and

were kept in separate rooms before viewing the lineup (Trial Tr. at 110).

    2.  <u>Petitioner's Defense</u>

Petitioner presented an alibi defense.  Specifically, petitioner contended that on the day of the shooting he was in Deltona, Florida, where he had been residing since approximately May 26, 1996, and that he did not leave Florida until June 29 after he heard from his family in New York that the police were looking for him.

Petitioner presented two alibi witnesses at trial, Jenine Seda and John Torres, who traveled from Florida to testify that petitioner was living with them, and that they both saw him on the day of the murder, June 19.

Seda testified that she had known petitioner since December of 1995, and that petitioner was staying at her house in Deltona from approximately the end of April or beginning of May, 1996 until about June 30 (Trial Tr. at 307-08, 323).  Seda testified that while petitioner was living with her and her boyfriend, John Torres, petitioner and John[2], who were good friends, spent most of their time together because neither of them were working (Trial Tr. at 311).  Seda testified that she

---

[2]Because this report and recommendation repeatedly refers to witnesses with the same surname, I refer to individuals with non-unique surnames by their first name.

knew petitioner was at her house on June 19 (Trial Tr. at 312), and that she remembers that day because it was the day before her son was born (Trial Tr. at 335). Seda also stated that she was admitted to the hospital at about 5:00 a.m. on June 20 and that petitioner was at her home when she returned from the hospital on June 21 (Trial Tr. at 328). Seda testified that while traveling from Florida to New York for the trial, she and John Torres did not discuss either their memories regarding June 19 or the fact that they were testifying (Trial Tr. at 324-25).

John Torres testified that petitioner was living with him from about April until June 19, 1996, when petitioner went to live with John's brother, Robert Torres, to make room for John and Seda's new baby (Trial Tr. at 344, 360-61). John testified that on June 19 his car broke down and he spent the day with petitioner looking for car parts before returning to John's home (Trial Tr. at 347). John had no receipts or other documents to corroborate that his car had broken down or that parts were purchased that day (Trial Tr. at 349). John testified further that Seda was working on June 19. John also stated that in June, 1996 he was working at a toll plaza five days a week (Trial Tr. at 349). John testified that while he and Seda were traveling to New York for the trial they discussed the fact that they would be testifying and what might happen (Trial Tr. at 351).

Petitioner also offered the testimony of the New York terminal manager for Greyhound Busline and introduced as evidence a "readout of a transaction" for the sale of a bus ticket. The "readout" indicated that Richard Rosario had purchased tickets to travel from Orlando, Florida to New York on June 30, 1996 (Trial Tr. at 366-69). The manager testified that while the "readout" gives the name of the passenger, date of purchase, and destinations, Greyhound does not routinely require a passenger to submit identification upon paying or boarding (Trial Tr. at 371-72).

Petitioner testified in his own defense regarding three different time periods when he was in Deltona, Florida. The first was a two-week visit in late December, 1995 until early January of 1996, during which he met John Torres and Jenine Seda (Trial Tr. at 377-80). The second was a visit from February through mid-April, 1996 (Trial Tr. at 386-87). The third was from late May, 1996 until June 30, 1996. During the second and third trips, petitioner had hoped to find work, re-locate to Florida, and have his fiancé, Minerva Godoy, and their children join him in Florida (Trial Tr. 399-400). Petitioner stated that both he and his friend John Torres were not working in June 1996 and that during his trip in May and June, Ms. Godoy wired money to him via Western Union on at least three occasions (Trial Tr. 422-24). Because petitioner did not have a valid, government-issued identification that was required to receive a money wire

8

transfer, Ms. Godoy transmitted the money to John to give to petitioner (Trial Tr. at 423). Petitioner testified that he lived at John and Seda's home from the end of May until after the baby was born on June 20, when he left to stay with his friend Ray so that John and Jenine could have more privacy and space (Trial Tr. at 409-10). Petitioner recalled that he was with John Torres when John's car broke down and they went looking for parts; however, petitioner could not recall whether this occurred on June 19 or a different day before the baby was born (Trial Tr. at 419). On June 30, petitioner left Florida and returned to New York after his sister told him that detectives were looking for him in connection with a murder (Trial Tr. at 388-89).

During Cross-examination, the prosecutor questioned petitioner about his February to April, 1996 visit to Florida. Petitioner testified that he stayed at the home of a friend, Shannon Beane, until he left for New York on April 13 (Trial Tr. at 394-95).

            3.___The Prosecution's
                Rebuttal Case

The prosecution presented as a rebuttal witness Captain Bruce Bolton of Volusia County, Florida, Department of Correc-tion. Captain Bolton testified that he was the records custodian of the Volusia County Department of Corrections in Daytona, Florida and that the Department's records showed that petitioner

was in custody in Volusia County from March 13, 1996 until April 12, 1996.

Before Captain Bolton testified, petitioner's attorney, Steven Kaiser, objected to the rebuttal evidence on the grounds that: (1) petitioner was never directly questioned about whether he was incarcerated during the period of time at issue and given the opportunity to address the issue before the improper intro-duction of extrinsic evidence on a collateral matter and (2) the introduction of this "bad act" evidence would result in unjust prejudice against petitioner and that petitioner had never been given the opportunity of seeking a <u>Sandoval</u>[3] hearing outside the presence of the jury concerning this period of incarceration (Trial Tr. at 435-37). The Court allowed the testimony, accept-ing the prosecution's argument that the captain's testimony was part of disproving petitioner's alibi defense that he was living with the other witnesses in Florida (Trial Tr. at 439).

4. <u>Summations</u>

Defense counsel's summation focused on inconsistencies between the descriptions of the shooter that the eyewitnesses gave to detectives and in court, such as differences regarding the shooter's approximate height, facial characteristics, and

---

[3]<u>People v. Sandoval</u>, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974).

clothing.  Defense counsel also stressed the unreliability of
eyewitness identifications (Trial Tr. at 488-503).  Counsel
pointed out that if petitioner's alibi witnesses, John and Seda,
were conspiring to give false testimony on petitioner's behalf,
then their testimonies would be more, not less, consistent with
each other (Trial Tr. at 474).  Defense counsel suggested to the
jury that petitioner was not dishonest when he testified that he
stayed with a friend during a time period that included his four
weeks in the county jail, as it is consistent for a person to say
they live in one place even if they are temporarily incarcerated
elsewhere during that time (Trial Tr. at 485).

      During its summation, the prosecution focused on the
credibility of the eyewitnesses, Sanchez and Davis, while mini-
mizing the inconsistences in the descriptions they gave to
detectives after the shooting (Trial Tr. at 520-21).  With regard
to petitioner's witnesses, the prosecutor explained to the jury
"that the little things about the testimony [are] what you have
to look at to determine if you can rely on the witnesses" (Trial
Tr. at 528-29).  The prosecution then suggested that Jenine Seda
and John Torres "are interested witnesses, interested because
they have an interest in the outcome of the case.  They don't
want to see their friend go to jail" (Trial Tr. at 529).  Because
John and Seda were inconsistent on "little things," such as
whether John was working on and around June 19, 1996, the prose-

cution suggested that John and Seda were unreliable witnesses (Trial Tr. at 530).  The prosecution argued that John and Seda's inconsistent testimony about whether they discussed the trial while traveling to New York also demonstrated their unreliability (Trial Tr. at 532).  The prosecution pointed out that John and Seda both testified inaccurately that defendant lived with them from early April through June (Trial Tr. at 531).  Moreover, the prosecution noted that the Greyhound ticket evidence offered by the defense does not really establish anything since Greyhound does not check the identification of its passengers (Trial Tr. at 533).

With respect to petitioner's testimony that he lived with Shannon Bean while he was actually incarcerated, the prosecution suggested that petitioner's responses were untruthful because he did not want the jury to know that he was in jail. According to the prosecution, this showed that petitioner was willing to lie on the stand and mislead the jury (Trial Tr. at 536).

5.  <u>Jury Instructions</u>

The Trial Judge informed the jury that an interested witness is one who, "by reason of relationship [or] friendship" with either a party or a witness, might give biased testimony in favor of that person and that an interested witness' testimony

12

may be accepted despite, or rejected in light of, that witness'
interest in the outcome of the case (Trial Tr. at 558-559).

        The Trial Judge also gave a limiting instruction
regarding the evidence concerning petitioner's incarceration in
Florida in March and April of 1996.  The judge told the jury that
the evidence of the incarceration could not be considered as
evidence of petitioner's propensity to commit crimes.  He did,
however, advise the jury that it could be considered "in deter-
mining the credibility of witnesses who have appeared before you"
(Trial Tr. at 565).

    B.  Procedural History

        1.  _Petitioner's
              Direct Appeal

        Petitioner appealed his conviction to the Appellate
Division of the New York State Supreme Court, First Department,
arguing:  (1) the prosecutor's introduction of extrinsic evidence
that petitioner was incarcerated during a period that ended over
two months before the June 19 shooting deprived petitioner of his
Fourteenth Amendment Due Process right to a fair trial (Brief for
Defendant-Appellant ("App. Div. Br.") at 32-46, annexed as
Exhibit 1 to Affidavit in Opposition to Habeas Corpus Petition
("Resp. Op.") (Docket Item 12)); (2) the prosecutor's use of all
six peremptory challenges to strike prospective African-American

13

jurors established a <u>prima</u> <u>facie</u> case of discrimination under
<u>Batson</u>, requiring the prosecution to offer race-neutral reasons
for its challenges (App. Div. Br. at 46-53); and (3) the cumula-
tive impact of the prosecutor's improper tactics misled and
unfairly influenced the jury in violation of petitioner's Four-
teenth Amendment Due Process right to a fair trial (App. Div. Br.
at 53-63).

      The Appellate Division unanimously affirmed peti-
tioner's conviction on November 27, 2001.  The Appellate Division
held that (1) the Trial Court properly exercised its discretion
in allowing the prosecution to introduce rebuttal evidence that
petitioner was incarcerated, as it tended to disprove his alibi,
was not collateral because petitioner made his multiple trips to
Florida "integral parts of his alibi defense," and had minimal
prejudicial effect particularly in light of the Trial Court's
limiting instruction; (2) petitioner had failed to establish a
<u>prima</u> <u>facie</u> case of racial discrimination by the prosecutor's use
of peremptory challenges because the mere number of the prosecu-
tion's peremptory challenges against African-American prospective
jurors did not establish a <u>prima</u> <u>facie</u> case, and petitioner
failed to show disparate treatment or other relevant circum-
stances raising an inference of discriminatory purpose; and (3)
petitioner's challenges to the prosecutor's questioning of
witnesses and comments in summation were not preserved, and, in

14

any event, did not present a basis for reversal.  People v.
Rosario, 288 A.D.2d 142, 142-143, 733 N.Y.S.2d 405, 406-407 (1st
Dep't 2001).

      The New York State Court of Appeals denied petitioner's
leave to appeal on March 26, 2002.  People v. Rosario, 97 N.Y.2d
760, 769 N.E.2d 367, 742 N.Y.S.2d 621 (2002).

            2.   Petitioner's
               Motion to Vacate

      On June 11, 2003, petitioner filed a motion pursuant to
New York Criminal Procedure Law Section 440.10 to vacate the
judgment of conviction, arguing that he had been denied effective
assistance of counsel.  The Honorable Edward M. Davidowitz,
Justice of New York State Supreme Court, Bronx County held an
evidentiary hearing at which petitioner presented seven of his
purported alibi witnesses, two of his defense attorneys (Joyce
Hartsfield and Steven J. Kaiser) and Hartsfield's investigator on
the case, Jessie Franklin.  In a twenty-two page opinion, Justice
Davidowitz denied relief, finding that both Hartsfield and Kaiser
provided petitioner with "meaningful representation" (Decision
and Order of the Honorable Edward M. Davidowitz, Justice of the
Supreme Court, dated April 4, 2005 ("440 Order"), annexed as
Exhibit 17 to Resp. Op., at 18).

The Appellate Division denied leave to appeal Justice Davidowitz's decision on September 8, 2005 (Certificate Denying Leave, annexed as Exhibit 19 to Resp. Op.).

Petitioner filed his petition for a writ of habeas corpus on September 16, 2005.

C.   The Current Petition

As noted above, petitioner asserts four claims: (1) that petitioner was denied his Sixth Amendment right to effective assistance of counsel based on his attorneys' failure to adequately investigate and to present additional witnesses and documentary evidence in support of his alibi defense; (2) that the Trial Court erred when it refused to find a prima facie case of discrimination under Batson v. Kentucky, supra, 476 U.S. 79 and when it refused to require the prosecution to give race-neutral grounds for using all of its peremptory challenges to strike African-American prospective jurors; (3) that the Trial Court deprived petitioner of his Due Process right to a fair trial by erroneously admitting extrinsic evidence that petitioner had been in jail three months before the murder; and (4) that petitioner is actually innocent of the crime of which he was convicted (Pet. Mem. at 2-3).

16

III.  Analysis

A.  Standard of Review

Where the state court has decided a habeas petitioner's claims on the merits, a habeas petitioner must meet a stringent standard before a federal court can issue the writ.  Specifically, 28 U.S.C. § 2254(d), modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that in such a situation, habeas relief may be granted only when the Trial Court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained the alternative standards contained in the former paragraph as follows:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  Williams v. Taylor, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  See also Early v. Packer, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). . . .
>
> Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision

involved an "unreasonable application" of clearly
established law.  As we have explained:

> "[A] federal habeas court may not issue the writ
> simply because that court concludes in its inde-
> pendent judgment that the state-court decision
> applied [a Supreme Court case] incorrectly.  See
> <u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S.Ct.
> 1843, 152 L.Ed.2d 914 (2002); <u>Williams</u>, <u>supra</u>, at
> 411, 120 S.Ct. 1495.  Rather, it is the habeas
> applicant's burden to show that the state court
> applied [that case] to the facts of his case in an
> objectively unreasonable manner."

> <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25, 123 S.Ct.
> 357, 154 L.Ed.2d 279 (2002) (<u>per</u> <u>curiam</u>).

<u>Price v. Vincent</u>, 538 U.S. 634, 640-41 (2003); <u>accord</u> <u>Brown v.</u>
<u>Payton</u>, 544 U.S. 133, 139-40 (2005); <u>see</u> <u>also</u> <u>Lockyer v. Andrade</u>,
538 U.S. 63, 70-72 (2003); <u>Hawkins v. Costello</u>, 460 F.3d 238,
242-43 (2d Cir. 2006); <u>Brown v. Artuz</u>, 283 F.3d 492, 500-01 (2d
Cir. 2002).

In addition to the definition of "unreasonable applica-
tion" set forth above, a state court may unreasonably apply
Supreme Court precedent "if the state court unreasonably extends
a legal rule established by the Supreme Court or if it unreason-
ably fails to extend a legal rule to a context in which the rule
reasonably should apply." <u>Serrano v. Fischer</u>, 412 F.3d 292, 296-
97 (2d Cir. 2005), <u>cert</u>. <u>denied</u>, 546 U.S. 1182 (2006).

"Unreasonableness is determined by an 'objective'
standard." <u>Gersten v. Senkowski</u>, 426 F.3d 588, 607 (2d Cir.
2005), <u>cert</u>. <u>denied</u>, 126 S.Ct. 2882 (2006), <u>quoting</u> <u>Williams v.</u>
<u>Taylor</u>, 529 U.S. 362, 409 (2000).  In order for a state court's

18

application of Supreme Court precedent to be unreasonable,
"[s]ome increment of incorrectness beyond error" is required.
Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005), cert. denied, 547
U.S. 1040 (2006) (internal quotation marks omitted); accord Brown
v. Artuz, supra, 283 F.3d at 500-01; Aparicio v. Artuz, supra,
269 F.3d at 94.  However, "the increment need not be great;
otherwise, habeas relief would be limited to state court deci-
sions 'so far off the mark as to suggest judicial incompetence.'"
Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000), quoting
Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 889 (3rd Cir.
1999) (en banc); accord Gersten v. Senkowski, supra, 426 F.3d at
607.

        The nature of the rule in issue also impacts the
assessment of the reasonableness of the state court's action.

                [W]hile very specific rules may not permit much leeway
                in their interpretation, the same is not true of more
                general rules, the meaning of which "must emerge in
                application over the course of time."  [Yarborough v.
                Alvarado, 541 U.S. 652, 664 (2004)].  "The more general
                the rule, the more leeway courts have in reaching
                outcomes in case by case determinations."  Id.

Serrano v. Fischer, supra, 412 F.3d at 297; see also Hawkins v.
Costello, supra, 460 F.3d at 243.

        Both the "contrary to" and "unreasonable application"
clauses "restrict[] the source of clearly established law to [the
Supreme] Court's jurisprudence."  Williams v. Taylor, supra, 529
U.S. at 412.  "That federal law, as defined by the Supreme Court,

may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d 104, 110 (2d Cir. 2003); accord DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

In order to be entitled to the deferential standard of review under subsection 2254(d), the state courts must have resolved the petitioner's claims "on the merits." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 1993); see e.g. Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2001) ("[I]n order for this deferential standard of §2254 to apply, we must first determine that the state court considered [petitioner's claim] on its merits"); Sellan v. Kuhlman, 261 F.3d 303, 309-10 (2d Cir. 2001).

For habeas purposes, a state court is deemed to have reached the merits of a federal claim when the state court's decision "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law," unless there is a "clear and express statement of reliance on a state procedural bar." Jimenez v. Walker, 458 F.3d 130, 145 (2d Cir. 2006); see Coleman v. Thompson, supra, 501 U.S. 722, 739-40 (1991). Habeas courts in this circuit examine "the face of the state-court opinion,

20

. . . whether the state court was aware of a procedural bar, and
. . . the practice of state courts in similar circumstances" to
determine whether a state court decision falls into one of the
above classifications.  <u>Jimenez v. Walker</u>, <u>supra</u>, 458 F.3d at 145
n.16.

I shall address the nature of the state court's dispo-
sition of each of petitioner's claims in connection with my
discussion of each of the claims.

B.  <u>Petitioner's Claims</u>

1.  Ineffective
    <u>Assistance of Counsel</u>

Petitioner claims that he did not receive effective
assistance of counsel based on counsel's failure to investigate
petitioner's alibi defense adequately and to produce additional
witnesses and documentary evidence that would have supported
petitioner's alibi (Pet. Mem. at 18).

Petitioner was represented by at least four defense
attorneys after his arrest.  The representation provided by
petitioner's first two attorneys, one of whom represented peti-
tioner at arraignment, the other at petitioner's lineup, is not
at issue.  Petitioner's third attorney, Joyce Hartsfield, repre-
sented petitioner from about mid-July, 1996 until mid-February of

1998 (Hrg. Tr.[4] at 14).   Steven J. Kaiser represented petitioner
after Hartsfield and through his trial (Hrg. Tr. at 117).
Petitioner claims that Hartsfield and Kaiser's representation was
ineffective.

Petitioner asserts that he had always maintained that
he was in Florida on the date of the murder.   Immediately after
turning himself in, petitioner wrote a statement for the police
describing various events in Florida, providing the names of at
least eleven potential alibi witnesses and identifying potential
documentary evidence that he believed would establish his pres-
ence in Florida at the time of the murder (Pet. Mem. at 18;
Petitioner's Post-Arrest Statement ("Post-Arrest Stmnt."),
annexed as Exhibit 10 to the Declaration of Jodi K. Miller
("Miller Decl.")).   In his statement, petitioner claimed that he
went to Florida on a Greyhound bus around the end of May and did
not leave Florida until June 29, 1996.   Petitioner claimed that
several individuals in Florida could attest to his presence
there, including John Torres' mother, Margarita Torres, and his
father, Fernando Torres, as well as John Torres, Jenine Seda,
Robert Torres, David Guzman, Nereida Colon, "Ray MH," "Mike,"
"Gordo," and "Hector."[5]   Petitioner had addresses for most of

---

[4]"Hrg. Tr." refers to the transcript of the hearing held in
connection with petitioner's 440.10 motion.

[5]The record does not reveal the full names of "Ray MH,"
(continued...)

22

these individuals but not telephone numbers.  Petitioner also
reported in his post-arrest statement that during June, he and
Gordo went to a bail bondsman to bail out their friend Michael.
Petitioner also noted in his post-arrest statement that he had
been incarcerated during a previous trip to Florida, but that he
had been released from jail on April 12, 1996 (Post-Arrest
Stmnt).

        While Hartsfield was representing petitioner, she moved
for funds to investigate petitioner's alibi defense in Florida,
and the Trial Court granted that motion during a hearing in the
presence of Hartsfield and petitioner (Calendar Call Transcript,
dated March 19, 1997, annexed as Exhibit 29 to Miller Decl.).
Nevertheless, for unknown reasons, many of those alibi witnesses
were never contacted by detectives, prosecutors, investigators,
or petitioner's attorneys until petitioner's appellate counsel
found them in Florida after petitioner was convicted of
Collazo's murder.

                a.   Petitioner's
                     440 Hearing

        Because petitioner's claim of ineffective assistance
raised factual issues that were outside the record of his trial,
he properly asserted and exhausted the claim by way of a motion

---

        [5](...continued)
"Mike," "Gordo," or "Hector."

to vacate pursuant to New York Criminal Procedure Law Section
440.10.  Arce v. Smith, 889 F.2d 1271, 1272 (2d Cir. 1989)
(ineffective assistance claim normally raised by collateral
proceeding since its resolution "often requires evidence not
contained in the record"); Washington v. Greiger, 00 Civ. 2383
(RWS), 2001 WL 214236 at *3 (S.D.N.Y. Mar. 1, 2001) (same); Otero
v. Stinson, 51 F. Supp.2d 415, 418-419 (S.D.N.Y. 1999) (same);
Garcia v. Scully, 907 F. Supp. 700, 706 (S.D.N.Y. 1995) (same);
People v. Brown, 45 N.Y.2d 852, 382 N.E.2d 1149, 410 N.Y.S.2d 287
(1978).  Pursuant to petitioner's motion, the Trial Court con-
ducted an evidentiary hearing at which evidence was offered
establishing the following facts.

Hartsfield testified that she made no efforts to obtain
any documentary evidence in support of petitioner's alibi (Hrg.
Tr. at 32).  Though Hartsfield was aware that petitioner claimed
he bailed a friend out of jail in Florida in June of 1996, she
did not make any efforts to contact the bail bondsman identified
by petitioner (Hrg. Tr. at 27-28).  Hartsfield also admitted that
although petitioner had told her that his fiancé had wired money
to him in Florida in June of 1996, Hartsfield did not contact
Western Union to obtain records of those transactions (Hrg. Tr.
at 28).[6]  Petitioner also told Hartsfield that his fiancé had

---

[6]Petitioner's post-conviction counsel attempted to obtain
these records from Western Union in June, 2004, but Western Union
                                                    (continued...)

called petitioner in Florida at a public pay phone, yet
Hartsfield made no effort to obtain toll records of those calls
(Hrg. Tr. at 30).  Petitioner's counsel questioned Hartsfield
about a police "field contact report" that noted that petitioner
had been stopped by the police in Deltona, Florida on May 30,
1996, but Hartsfield could not recall whether petitioner had told
her about that event (Hrg. Tr. at 30-31).

        Petitioner had told Hartsfield that he knew several
people who could corroborate that he was in Florida on the day of
the murder (Hrg. Tr. at 14).  In response to this information,
Hartsfield hired an investigator, Jessie Franklin, to assist her
in finding and interviewing petitioner's potential alibi wit-
nesses (Hrg. Tr. at 43).  Hartsfield and Franklin initially
decided that they would focus their investigation on the couple
with whom petitioner had lived during June, 1996, John Torres and
Jenine Seda, because it appeared they were in the best position
to confirm petitioner's presence in Florida on the day of the
murder, June 19 (Hrg. Tr. at 88).  Hartsfield did not know
whether other witnesses could also provide an alibi for June 19
(Hrg. Tr. at 107).  On October 25, 1996, Franklin spoke by
telephone with John Torres's father, Fernando Torres, and his

---

        [6](...continued)
responded that it only maintained these records for 60 months,
i.e. until June, 2001 (June 17, 2004 letter from Stacy C.
Anderson of Western Union to Morrison & Foerster, LLP in response
to subpoena, annexed as Exhibit 53 to Miller Decl.).

brother, Robert Torres, but was unable to locate John Torres at that time (Jessie Franklin Activity Log, annexed as Exhibit 17 to Miller Decl.).

On October 29, 1996, after Franklin was unsuccessful in her attempts to contact John Torres, Jenine Seda, and several other potential witnesses, Hartsfield filed an omnibus motion on behalf of petitioner requesting, inter alia, court authorization to send an investigator to Florida to find credible alibi witnesses (Hrg. Tr. at 43). The motion was accompanied by an affidavit signed by Franklin, stating that she had only been able to speak with two potential alibi witnesses, that her attempts to contact other witnesses who had moved or who did not have access to a telephone had been unsuccessful, and that she needed to travel to Florida to conduct an effective investigation concerning petitioner's defense (Affidavit of Jessie Franklin, sworn to Oct. 29, 1996 ("Franklin Af.") attached to Notice of Omnibus Motion, annexed as Exhibit 25 to Miller Decl.). During a hearing on March 19, 1997, the Honorable Joseph Fisch, Justice of New York State Supreme Court, Bronx County, granted Hartsfield's request to send Franklin to Florida (Hrg. Tr. at 48). Hartsfield, however, did not recall whether the request had been granted until she reviewed the transcript of the March 19, 1997 proceeding in preparation for the 440.10 hearing (Hrg. Tr. at 50).

On September 22, 1997, several months after Justice Fisch granted Hartsfield's request to send an investigator to Florida, Franklin finally located and interviewed John Torres and Jenine Seda in Pennsylvania, where the two were then residing (Hrg. Tr. at 91).

Hartsfield never sent Franklin to Florida and was unable to explain why, although she believed there could have been logistical reasons (Hrg. Tr. at 50). Hartsfield also testified that if she had realized the motion had been granted, then she would have sent Franklin to Florida, suggesting that she had been unaware of the outcome of her omnibus motion in 1997 (Hrg Tr. at 51). She testified that she did not make a conscious strategic decision to limit potential alibi witnesses to Jenine Seda and John Torres (Hrg. Tr. at 73). Rather, Hartsfield acknowledged the success of an alibi defense turned on the credibility of the witnesses and that an incredible alibi witness could jeopardize the defense (Hrg. Tr. at 95).

Kaiser represented petitioner from February 18, 1998 through pre-trial hearings and his trial (Hrg. Tr. at 117). Immediately before petitioner's 440.10 hearing, Kaiser submitted an affirmation, in which he stated that when he took petitioner's defense, Hartsfield had told him that the Court "had specifically denied her request to send the assigned investigator to Florida to follow-up on initial alibi evidence already adduced" (Affirma-

tion of Steven Kaiser, dated Dec. 31, 2003, annexed as Exhibit 50 to Miller Decl. ("Dec. 31, 2003 Kaiser Affirm.")).  Hartsfield's then submitted an affirmation, stating that after she reviewed the transcript of the March 19, 1997 hearing before Justice Fisch, she recalled that the justice had granted expenses for a Florida investigation; she did not recall telling Kaiser that the judge had denied the expenses (Affirmation of Joyce Hartsfield, dated Jan. 29, 2004, annexed as Exhibit 51 to Miller Decl.).  On February 7, 2004 Kaiser submitted another affirmation, stating that on January 30, 2004 he received and read Hartsfield's affirmation and the minutes of the March 19, 1997 hearing before Justice Fisch, and Kaiser retracted his prior statement that Hartsfield had told him her request to send an investigator to Florida had been denied (Affirmation of Steven Kaiser, dated Feb. 7, 2004, annexed as Exhibit 52 to Miller Decl. ("Feb. 7, 2004 Kaiser Affirm.")).  Kaiser asserted in this second affirmation that he did the best he could under the mistaken belief that the request for investigative expenses had been denied, that he used mail and telephone to try to establish contact with witnesses in Florida, and that he made arrangements for the known alibi witnesses to be able to travel to New York to testify (Feb. 7, 2004 Kaiser Affirm.).

          Kaiser testified that he is not certain who he spoke with in Florida other than John Torres and Jenine Seda, but he

believed he spoke to John's father, Fernando Torres, his wife,
Margarita Torres, and "contemporaries of Torres and Seda" (Hrg.
Tr. at 124-25).  These individuals told Kaiser that they could
not afford to travel to New York.  Kaiser suspected that lack of
finances was being used as an excuse by people "not as eager to
help Mr. Rosario when [Kaiser] was dealing with them as they
might have been when Mr. Barry, the investigator for Legal Aid
Society was with them in their home . . . not necessarily because
they weren't going to be truthful.  But just that they weren't
that thrilled about the prospect of having to leave whatever they
were doing and come up and it was more than just the money" (Hrg.
Tr. at 194-95).  Because Kaiser believed the court had denied
funding to send an investigator to Florida, he testified that he
also believed funding for witnesses to travel to New York would
likewise be denied.  Kaiser did not, therefore, request such
funds or advise any potential witnesses that such costs could be
reimbursed (Hrg. Tr. at 128).

        Kaiser testified that while preparing petitioner's
trial, he (Kaiser) believed John Torres and Jenine Seda were the
best witnesses because they could establish the date of peti-
tioner's presence in Florida by virtue of their son's birth on
June 20 and because they had no prior convictions that the
prosecution might use to impeach them (Hrg. Tr. at 196, 221,
225).  Kaiser believed that other potential witnesses with whom

29

he spoke would have only provided similar testimony and were not as cooperative (Hrg. Tr. at 195). Kaiser also admitted, however, that he would have preferred to have had more alibi witnesses, especially ones who did not live with petitioner (Hrg Tr. at 196-99).

Jessie Franklin testified that she was hired by Hartsfield to investigate petitioner's alibi defense. According to Franklin's notes, she met with petitioner on September 23, 1996 at Rikers Island, and petitioner gave Franklin addresses for John Torres, Robert Torres and his wife Chenoa, Ricardo Ruiz, and Nerida Colon. He also gave Franklin a telephone number where he believed another potential witness, Denise Hernandez, could be reached (Jessie Franklin's notes, dated Sept. 23, 1996, annexed as Exhibit 19 to Miller Decl.).

Franklin also testified that prior to drafting an affidavit in support of the motion for funding to investigate in Florida, she was only able to reach two of petitioner's potential alibi witnesses, Fernando and Robert Torres, with whom she spoke for a total of approximately one hour (Hrg. Tr. at 384-85, 403-04). Franklin's notes indicate that on October 25, 1996, Fernando told her that "in the latter part of June" he, his son John and petitioner had looked for car parts and that petitioner had contributed thirty dollars toward the purchase of the parts because he had been using the car and was going to New York (Hrg.

30

Tr. at 391 -92, 438).  Franklin testified that, according to her

notes, Fernando did not specifically tell her that he saw peti-

tioner on June 19, and she had not asked Fernando about his

arrest history as she normally would have if a potential witness

were cooperative (Hrg. Tr. at 437-38).  Franklin's October 25

notes also indicate that Robert Torres had reported to her that

petitioner left John's home after the baby was born on June 20

and then stayed with David Guzman (Jessie Franklin's notes, dated

Oct. 25, 1996, annexed as Exhibit 21 to Miller Decl.).  Franklin

did not contact Fernando or Robert again and assumed the request

for funding for her to investigate in Florida had been denied

because she never heard otherwise from Hartsfield (Hrg. Tr. at

404, 407).

        Franklin re-opened her investigation into petitioner's

case in September, 1997 and interviewed Jenine Seda and John

Torres (Hrg. Tr. at 411).  John Torres informed Franklin that he

could provide a list of names of other alibi witnesses in Florida

(Hrg. Tr. at 413).  Franklin also attempted at that time to

contact a number of other individuals named by petitioner, but

was unsuccessful (Hrg. Tr. at 416-17).  When Franklin spoke with

Seda and John Torres, she did not make any determinations as to

whether they would be the best witnesses for petitioner.  Rather,

John and Seda were the ones Franklin could contact at that time,

and Franklin still considered it necessary to investigate peti-

tioner's alibi further (Hrg. Tr. at 418-20, 433).  After Kaiser
took petitioner's case, Kaiser never contacted Franklin to
discuss witnesses or to follow up on what she learned in her
investigation (Hrg. Tr. at 422).

Fernando Torres testified he remembered spending June
19 with petitioner and his son, John Torres, after John's car
broke down and the three of them looked for car parts.  Fernando
did not know until several years later that the crime for which
petitioner was arrested had occurred on June 19 (Hrg. Tr. at 318,
364, 372, 374).[7]  Fernando's written statement, which was also
submitted as evidence in support of the motion to vacate, asserts
that he knew petitioner was in Florida on June 19 because he saw
petitioner in John's apartment; the statement does not mention
that Fernando spent time that day with petitioner looking for car
parts (Statement of Fernando Torres, signed Nov. 9, 2002, annexed
as Exhibit 56 to Miller Decl.).  Fernando could not recall being
contacted by a lawyer or an investigator regarding petitioner
until 2004, although he testified that Jessie Franklin's name
sounded familiar to him (Hrg. Tr. at 329, 332-33).  Fernando
testified that petitioner's sisters had to pay for John and Seda

---

[7]During Fernando's cross-examination at the 440 hearing,
respondent's counsel reported that Fernando had informed
petitioner's counsel, Jodi Miller, that he, petitioner and John
looked for car parts three or four days before John's baby was
born.  Petitioner's counsel agreed to submit a stipulation
regarding this, but no such stipulation has been included in
petitioner's habeas submissions (Hrg. Tr. at 344).

to travel to New York to testify, and that the sisters had told
him petitioner's attorney suggested John's testimony would be
sufficient (Hrg. Tr. at 332-33).  Fernando testified that he
would have come to New York to testify at petitioner's trial if
he had been asked to and been provided with money to cover travel
expenses (Hrg. Tr. at 333-34).

  Ricardo Ruiz testified that he saw petitioner about
five times a week during the month of June, 1996, and that he saw
petitioner several days after John Torres' baby was born (Hrg.
Tr. at 463, 488).  Ricardo could not recall whether or not he saw
petitioner on June 19 (Hrg. Tr. at 476), but he believed peti-
tioner had been in Florida since the winter of 1995-96 except for
a brief period after his release from jail in April (Hrg. Tr. at
479).

  Chenoa Ruiz lived next door to John Torres and Jenine
Seda while petitioner was staying with them in June, 1996 (Hrg.
Tr. at 497).  Chenoa testified that she did not like petitioner
because John was "hanging out" with petitioner instead of prop-
erly attending to Seda during her pregnancy (Hrg. Tr. at 503).
Chenoa testified that on the night of June 18, 1996, when she
took Seda to the hospital, she saw petitioner with John and some
of their friends at John and Seda's home (Hrg. Tr. at 500, 547).
Chenoa also testified that she saw petitioner at John and Seda's
home on June 19, both at about 11:30 a.m. when she picked up Seda

for a doctor's appointment, and again several hours later when she brought Seda back (Hrg. Tr. at 548, 550). Petitioner's presence at John and Seda's home on these days stuck in Chenoa's mind because, in her words, petitioner was like a "spotlight" and caused problems for her and Seda by staying out late with their boyfriends (Hrg. Tr. at 527). Chenoa could not recall whether petitioner went to New York after he got out of jail in April, 1996. Chenoa also did not know when petitioner left Florida after Seda gave birth (Hrg. Tr. at 530-31). Chenoa testified that petitioner's appellate counsel was the first person to contact her about petitioner's case (Hrg. Tr. at 509), and that she would have testified at petitioner's trial had she been asked to (Hrg. Tr. at 510).

        Minerva Godoy is the mother of petitioner's children and was his fiancé at the time of his arrest (Hrg. Tr. at 566). Godoy testified that petitioner left New York in May, 1996 intending to relocate in Florida (Hrg. Tr. at 568). Godoy sent money to petitioner using Western Union in June 1996, but that money had to be sent to John Torres because petitioner did not have proper identification to receive a money transfer (Hrg. Tr. at 570-72). Godoy testified that she informed petitioner's "female attorney" of the money transfer and that she telephoned petitioner in Florida on multiple occasions in June, 1996 (Hrg. Tr. at 580). Godoy recalled that petitioner called her the day

34

after John and Seda's baby was born and told her that he was
going to see their baby (Hrg. Tr. at 618).

Denise Hernandez testified that she and petitioner
dated in Florida from about February, 1996 until some time in
June of 1996, and that during that time she saw petitioner
approximately four times per week (Hrg. Tr. at 627-28).
Hernandez could not attest to petitioner's whereabouts on June
19, 1996 or the days immediately before or after that day.  All
Hernandez could recall was that she and petitioner had an argu-
ment in Florida in mid to late June because petitioner had taken
her car without permission (Hrg. Tr. at 628).  Hernandez believed
the argument occurred close to the day of the shooting because
her sister's birthday present was in the car when petitioner took
it, and her sister's birthday is June 26 (Hrg. Tr. at 629).
Hernandez testified that she broke up with petitioner, in
Florida, about two weeks before he left for New York (Hrg. Tr. at
629).

Lisette Rivera is a friend of Denise Hernandez who
testified that she was present when petitioner took Hernandez's
car in approximately June, 1996 (Hrg. Tr. at 672).  Rivera
believed the incident occurred about five days before Hernandez's
sister's birthday; however, she also testified that she believed
the sister's birthday was in mid-June rather than late June (Hrg.
Tr. at 673).  Before Rivera learned the date of the shooting for

35

which petitioner was convicted, she submitted an affidavit that
she saw petitioner regularly in Florida between June and November
of 1996 (Hrg. Tr. at 698).

          Both Hernandez and Rivera admitted that they had been
in touch with petitioner since his conviction and had written and
visited with him at least twice (Hrg. Tr. at 633, 677).

          Michael Serrano testified that he was a good friend of
John Torres' brother, Robert, and knew petitioner while he was
staying with John Torres in June, 1996 (Hrg. Tr. at 718).  Though
Serrano could not recall the date that Jenine and John's baby was
born, he remembered that he was with petitioner, Robert Torres
and Ricardo Ruiz outside Jenine and John's home when John re-
turned from the hospital on the day of the child's birth (Hrg.
Tr. at 719, 732).  Serrano testified he was never contacted by
anyone regarding petitioner's case until an investigator reached
him in 2002.  Serrano also stated that he would have testified at
petitioner's trial had he been asked (Hrg. Tr. at 722-24).

          After hearing all the foregoing testimony and consider-
ing additional written submissions, Justice Davidowitz denied
petitioner's motion to vacate, holding that Hartsfield and Kaiser
provided petitioner with "meaningful representation" as required
by People v. Benevento, 91 N.Y.2d 708, 697 N.E.2d 584, 674
N.Y.S.2d 629 (1998).  This standard for ineffectiveness is
"ultimately concerned with the fairness of the process as a

whole. . ." (440 Order at 15, 22).  Justice Davidowitz found that
although both Hartsfield and Kaiser were mistaken regarding
whether Justice Fisch had granted funding to investigate in
Florida, that mistake "was not deliberate" and "does not alter
the fact that both attorneys represented defendant skillfully,
and with integrity . . ." (440 Order at 18).  Justice Davidowitz
concluded that Kaiser presented a credible alibi defense to the
jury and a number of the witnesses who testified at the post-
conviction hearing would not have strengthened the alibi defense
(440 Order at 17-19).  Justice Davidowitz also held that trial
counsel's performance should not upset the jury's verdict, as the
verdict was "amply supported by the evidence" (440 Order at 19-
22).

        In addition, Justice Davidowitz found that the testi-
mony of the alibi witnesses petitioner presented at his hearing
was not "newly discovered evidence" because: (1) petitioner knew
who the witnesses were and gave their names to police at the time
of his arrest; (2) the substance of the alibi witness' testimony
was known before trial and (3) counsel had made efforts to speak
to the witnesses prior to petitioner's trial.  Moreover, Justice
Davidowitz found that the testimony of these witnesses would have
been merely cumulative of the testimony of the alibi witnesses
presented at petitioner's trial (440 Order at 19-20).

37

Justive Davidowitz's decision constitutes a ruling on the merits of petitioner's ineffective assistance claim and is, therefore, entitled to the AEDPA's deferential standard or review.  "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007), quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).  Justice Davidowitz expressly found that petitioner had received "meaningful representation" (440 Order at 18).  The use of this language, along with the absence of any suggestion in Justice Davidowitz's decision of a procedural basis for the ruling, constitutes an adjudication of the merits of petitioner's federal ineffective assistance claim, sufficient to entitle Justice Davidowitz's decision to the AEDPA'a deferential standard of review.  Gersten v. Senkowski, 426 F.3d 558, 698, 606 (2d Cir. 2005); Eze v. Senkowski, 321 F.3d 110, 123-24 (2d Cir. 2003); Loliscio v. Goord, 263 F.3d 178, 193 (2d Cir. 2001); Acensio v. McKinney, 05-CV-1026 (NGG), 2007 WL 2116353 at *14 & n.19 (E.D.N.Y. July 20, 2007).[8]_____

_____

[8]As discussed in Henry v. Poole, 408 F.3d 48, 68-72(2d Cir. 2005) and in Acensio v. McKinney, supra, 2007 WL 2116353 at *14, the Court of Appeals for the Second Circuit has expressed some doubt as to whether a finding of "meaningful representation" will always constitue a finding that federal Sixth Amendment standards have been met.  However, it appears to be the law in this Circuit that a state court's finding of "meaningful representation," where the state court was aware of a defendant's federal claim
(continued...)

<u>                    </u> b.      Failure to Investigate and
                            Present Additional Alibi
                            Evidence as Ineffective
<u>                    </u>        <u>Assistance of Counsel</u>

<u>          </u>

        In order to prevail on a claim of ineffective assis-

tance of trial counsel, the petitioner here must show that the

State Supreme Court unreasonably applied the now familiar two-

part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668,

686-87 (1984):

            The benchmark for judging any claim of ineffec-
        tiveness must be whether counsel's conduct so under-
        mined the proper functioning of the adversarial process
        that the trial cannot be relied on as having produced a
        just result.

            . . . .

            A convicted defendant's claim that counsel's
        assistance was so defective as to require reversal of a
        conviction . . . has two components.  First, the defen-
        dant must show that counsel's performance was defi-
        cient.  This requires showing that counsel made errors
        so serious that counsel was not functioning as "coun-
        sel" guaranteed by the Sixth Amendment.  Second, the
        defendant must show that the deficient performance
        prejudiced the defense.  This requires showing that
        counsel's errors were so serious as to deprive the
        defendant of a fair trial, a trial whose result is
        reliable.  Unless a defendant makes both showings, it
        cannot be said that the conviction . . . resulted from
        a breakdown in the adversary process that renders the
        result unreliable.

<u>                    </u>

        [8](...continued)
and the federal standard, constitutes an adjudication on the
merits of a Sixth Amendment ineffective assistance claim.  <u>See</u>
<u>Eze v. Senkowski</u>, <u>supra</u>, 321 F.3d at 121-22.

Accord <u>Lynn v. Bliden</u>, 443 F.3d 238, 247 (2d Cir. 2006), <u>cert</u>. <u>denied</u>, 127 S.Ct. 1383 (2007); <u>Davis v. Greiner</u>, 428 F.3d 81, 87 (2d Cir. 2005); <u>Greiner v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005), <u>cert</u>. <u>denied</u>, 126 S.Ct. 1363 (2006); <u>Aeid v. Bennett</u>, 296 F.3d 58, 62-63 (2d Cir. 2002); <u>Hernandez v. United States</u>, 202 F.3d 486, 488 (2d Cir. 2000); <u>Guerrero v. United States</u>, 186 F.3d 275, 281-82 (2d Cir. 1999); <u>McKee v. United States</u>, 167 F.3d 103, 106-07 (2d Cir. 1999); <u>Jackson v. Leonardo</u>, 162 F.3d 81, 85 (2d Cir. 1998).

In determining whether counsel's performance was objectively deficient, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at 689 (internal quotation marks omitted).

The second prong of the test -- actual prejudice -- requires the petitioner to show that, but for trial counsel's errors, there is a "reasonable probability" that the result of the trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at 694. Because the test is conjunctive, a habeas petitioner's failure to

satisfy either prong requires that the challenge to the convic-
tion be rejected.  Strickland v. Washington, supra, 466 U.S. at
697.

Petitioner claims that but for his trial counsel's
failure to adequately investigate and present his alibi defense
there is a reasonable probability that the jury would not have
found him guilty of Collazo's murder and that Justice
Davidowitz's decision denying petitioner's ineffective assistance
of counsel claims was both contrary to, and an unreasonable
application of, clearly established federal law.  I agree with
petitioner that under the Strickland two-part test, petitioner's
counsel performed below constitutionally reasonable standards,
and counsel's deficient performance caused petitioner to suffer
prejudice at his trial.  However, applying AEDPA's "objective"
standard articulated by the Supreme Court in Williams v. Taylor,
supra, 529 U.S. at 412, I find that the State Court's decision
denying petitioner's motion to vacate was neither an unreasonable
application of, nor contrary to, clearly established federal law.
Thus petitioner's claim for habeas corpus relief based on inef-
fective assistance of trial counsel should be denied because it
fails to reach the threshold for relief required by the AEDPA.

      c.   The Strickland Standard and
           the Merits of Petitioner's Claim

      i.   Deficient Performance

      Defense counsel "has a duty to make reasonable investi-
gations or to make a reasonable decision that makes particular
investigations unnecessary." Strickland v. Washington, supra,
466 U.S. at 690-91. Counsel's duty to investigate "includes the
obligation to investigate all witnesses who may have information
concerning [the defendant's] guilt or innocence." Towns v.
Smith, 395 F.3d 251, 258 (6th Cir. 2005).

      After successfully contacting only Robert and Fernando
Torres, Hartsfield believed that it was necessary to send an
investigator to Florida in order to prepare petitioner's alibi
defense adequately. Hartsfield drafted Franklin's affidavit in
which Franklin described her difficulties contacting witnesses
who had moved or who did not have telephones. Hartsfield also
recalled that it was important for Franklin to go to Florida to
have "face-to-face conversation[s]" with Robert and Fernando
Torres, to obtain additional leads for witnesses, and to estab-
lish petitioner's exact movements (Hrg. Tr. at 44-45). Yet, the
only explanation Hartsfield could offer for not sending Franklin
to Florida was that funding would have been difficult to arrange
(Hrg. Tr. at 50-52). Even though Franklin eventually located two
key alibi witnesses, John Torres and Jenine Seda, Hartsfield

42

admitted that she made no conscious strategic choice to limit the
alibi witnesses to John and Seda (Hrg. Tr. at 73).  Hartsfield
had also been informed, either through her investigator or
petitioner's post-arrest statement, of several possible items of
documentary evidence that tended to support petitioner's alibi,
yet she made no efforts to obtain any of them (Hrg. Tr. at 32).

        Kaiser's performance was also lackluster.  Kaiser never
contacted Franklin to discuss her investigation (Hrg. Tr. at
422).  Kaiser never reviewed the record to determine if
Hartsfield's motion for funding to send an investigator to
Florida had been granted.  Kaiser never conducted an investiga-
tion in Florida due to his mistaken belief that Hartsfield's
motion for funding had been denied.  Rather, Kaiser worked "as
best he could" from New York to secure petitioner's witnesses
(Dec. 31, 2003 Kaiser Affirm.).

        A failure to investigate that is a result of inatten-
tion rather than strategic judgment is unreasonable conduct for
defense counsel.  Wiggins v. Smith, 539 U.S. 510, 526 (2003).
"Strategic choices made after less than complete investigation
are reasonable precisely to the extent that reasonable profes-
sional judgments support the limitations on investigation."
Strickland v. Washington, supra, 466 U.S. at 690-91.  At the time
Justice Fisch granted Hartsfield's requests for funds for a
Florida investigation, Franklin had the full names of at least

43

eleven potential alibi witnesses that petitioner believed would still be Deltona, Florida.  Franklin had acquired addresses for at least five of these individuals, whom she had been unable to reach by telephone.  These include Chenoa Ruiz, Ricardo Ruiz, Nerida Colon, John Torres and Jenine Seda (Post-Arrest Stmnt.; Jessie Franklin's notes, dated Sept. 23, 1996, annexed as Exhibit 19 to Miller Decl.).  Within three days of his arrival in Florida, the investigator working for petitioner's post-conviction counsel was able to locate and interview several of the named but uncalled alibi witnesses whom trial counsel never interviewed, namely Chenoa Ruiz, Margarita Torres and Jeremy David Guzman (Affidavit of Joseph Barry, sworn to June 4, 2003, annexed to motion for an order pursuant to N.Y. Crim. Proc. L. § 440.10 vacating judgment, annexed as Exhibit 5 to Resp. Op.). The investigator also interviewed Fernando Torres, with whom Franklin, and possibly Kaiser, had only spoken by telephone. Thus, it appears that if Kaiser or Hartsfield had initiated an investigation in Florida, they would have been able to meet Fernando in person, as well as locate and interview Chenoa Ruiz, both of whom testified at petitioner's 440 hearing that they saw petitioner in Florida on June 19 and would have testified at petitioner's trial.

In this case, counsels' failure to locate and interview the potential witnesses whom petitioner had identified concerning

44

a viable defense cannot be deemed strategic; it was only by contacting the witnesses that counsel could determine whether they could help petitioner's case or lead counsel to additional defense witnesses or evidence.  See Garcia v. Poruondo, 459 F. Supp.2d 267, 287-89 (S.D.N.Y. 2006).  Thus, Hartsfield and Kaiser's failure to conduct an investigation that would have uncovered additional alibi witnesses, including Chenoa Ruiz, and/or other evidence, of whose existence counsel had already been informed, was constitutionally deficient performance.

Assuming Kaiser knew before petitioner's trial that Fernando Torres could have provided useful testimony regarding petitioner's alibi[9], Kaiser's decision not to pursue Fernando as a witness appears to have been based on a mistaken belief that he could not obtain funds for his travel expenses, and the decision was flawed because it was not based on "a plausible strategic calculus or an adequate pre-trial investigation." Pavel v. Hollins, 261 F.3d 210, 221-22 (2d Cir. 2001); see also Tosh v. Lockhart, 879 F.2d 412, 414 (8th Cir. 1989) (counsel's performance was deficient for failing to procure witness testimony that counsel knew was relevant).  Insofar as Kaiser believed that Fernando did not want to testify for reasons of expense and inconvenience, it was still unreasonable for Kaiser to forgo

---

[9]As noted at page 28, above, Kaiser was not sure whether he had spoken to Fernando Torres prior to petitioner's trial (Hrg. Tr. at 124).

Fernando's testimony.  See Washington v. Smith, 219 F.3d 620, 630 (7th Cir. 2000) (". . . placing witness convenience above the vital interests of [a] client does not make [a defense attorney's] decision reasonable -- or even really strategic.")  Even if Kaiser had been reasonable in his mistaken belief that Justice Fisch had not approved funding for investigative expenses for a Florida investigation, that did not excuse Kaiser from requesting assistance under a statute that permitted the Trial Court to order reimbursement of a defendant's indigent witness' reasonable travel expenses.  See McKinney's CPL § 610.50(2).  Kaiser's failure to take advantage of available procedural mechanisms to help secure the production of key witnesses was performance falling below a reasonable professional standard.  See Batten v. Griener, 97 Civ. 2378, 2003 WL 22284187 at *9 (E.D.N.Y. 2003). Kaiser's failure to procure witnesses, which was based on Kaiser's failure to review the record and accurately learn the outcome of the motion for investigative fees, cannot be considered reasonable or strategic.  Hence, his failure to arrange Fernando's presence at trial was constitutionally deficient.  See Noble v. Kelly, 89 F. Supp.2d 443, 463 (S.D.N.Y. 2000).

        Respondent suggests that since Fernando's testimony "mimicked" his son's trial testimony, defense counsel might have purposely decided not to use it because it was "'unnecessarily cumulative'" (Resp. Op. at 8 quoting United States v. Luciano,

46

158 F.3d 655, 660 (2d Cir. 1998)).  Hartsfield's testimony at the
440 hearing does not indicate she decided to forgo any alibi
witness testimony as cumulative; to the contrary, she believed
additional witnesses could have helped depending on how those
individuals would present at trial (Hrg. Tr. at 95).  While
Kaiser testified that Fernando Torres did not have new informa-
tion to add to petitioner's other alibi witnesses, Kaiser also
admitted that he was not sure he ever spoke with Fernando.
Kaiser had no notes documenting any conversations with Fernando,
and Fernando did not recall ever speaking with Kaiser (Hrg. Tr.
at 193, 353-54).  Kaiser also testified that he did not ask
additional potential witnesses to testify because they had told
him that traveling to New York would have been a hardship for
them, and Kaiser believed that they would not be reimbursed for
traveling expenses (Hrg. Tr. at 225).  Therefore I cannot find
that defense counsel concluded that Fernando's testimony would
have been unnecessary and cumulative, or that counsel made any
strategic choices regarding Fernando's testimony.

      For the reasons stated above, I find that Hartsfield's and
Kaiser's performances were objectively deficient for failing to
adequately investigate petitioner's alibi and present additional
witnesses at his trial.

ii.  Prejudice

As to the prejudice prong of Strickland, I conclude that there was a reasonable probability that Fernando and Chenoa's testimony would have affected the outcome of petitioner's trial

To show prejudice as a result of his counsel's failure to call additional alibi witnesses, petitioner must show that the uncalled witness would have provided relevant, non-cumulative testimony.  United States v. Luciano, supra, 158 F.3d at 660-67. Only two of the seven witnesses presented at the 440 hearing, Fernando Torres and Chenoa Ruiz, actually testified to seeing petitioner in Florida on June 19.

At petitioner's 440 hearing, Fernando testified consistently with John Torres that he spent part of June 19 with petitioner searching for car parts, and Chenoa testified that she saw petitioner twice on June 19 at the home of John Torres and Jenine Seda.   Respondents argue that the testimony of Fernando and Chenoa was cumulative to John Torres and Jenine Seda's testimony, and therefore, petitioner's counsel cannot be found ineffective for failing to present Fernando and Chenoa at trial (Resp. Op. at 8, 9-10).

A habeas petitioner cannot satisfy the prejudice prong of Strickland by showing that defense counsel failed to present exculpatory witnesses that would have been merely corroborative

48

of or cumulative to those who testified at trial.  See United
States v. Luciano, supra, 158 F.3d at 660-67.  Even though
Fernando's testimony about June 19 was repetitive of his son's,
cumulative or repetitive evidence will carry some weight "in a
situation where inconsistent testimony and credibility are at
issue."  United States v. Puco, 338 F. Supp. 1252, 1254 (1972).
Fernando's testimony was significant and non-cumulative because
it would not have been as susceptible to impeachment as his son's
testimony.  The prosecutor argued in summation that both John
Torres and Jenine Seda were "interested witnesses" who did not
want to see their friend go to jail (Trial Tr. at 529).  The
Trial Judge instructed the jury that it could consider a friend
of a defendant to be an interested witness whose testimony is
biased (Trial Tr. at 558).  Fernando, on the other hand, did not
have a similar personal relationship with petitioner and could
not have been impeached on that ground.  When the jury is faced
with a pure credibility determination, disinterested witnesses
can impact the determination and should not be considered cumula-
tive.  See Montgomery v. Peterson, 846 F.2d 407, 413 (7th Cir.
1988) (additional alibi witness would not have been cumulative
despite testimony by several other witnesses, where the addi-
tional witness did not suffer from the same credibility problems
as the others); Bohan v. Kuhlman, 234 F. Supp.2d 231, 251
(S.D.N.Y. 2002) (trial court erred in excluding testimony of

49

alibi witness who, if credited by the jury, would have "bolstered the testimony of [petitioner's] other alibi witnesses."); see also Bigelow v. Williams, 367 F.3d 562, 575 (6th Cir. 2004) (disinterested witnesses' testimony would not have been cumulative); Washington v. Smith, 219 F.3d 620, 634 (7th Cir. 2000) (rejecting state appellate court's conclusion that uncalled alibi witnesses' testimony would have been repetitive and thus cumulative; petitioner's whereabouts at the time of the crime was not an established fact, and the witnesses would have added credibility to petitioner's alibi defense.)[10]

Respondent also claims that Fernando's testimony is not credible because he may have been "honestly mistaken" about seeing petitioner on June 19 (Resp. Op. at 7). Respondent points out that Franklin's notes of her conversation with Fernando state that Fernando was with petitioner looking for car parts in "latter June," rather than stating that Fernando reported doing so specifically on June 19 (Resp. Op. at 7). However, respondent offers no evidence that when Franklin spoke to Fernando in October, 1996, Franklin had asked Fernando specifically about

---

[10]Respondent argues that, despite the prosecution's position at trial, Jenine Seda was not an interested witness and that petitioner's counsel did, therefore, offer disinterested alibi witness testimony at trial (Resp. Op. at 18-20). At petitioner's trial, the prosecution's summation clearly accused Seda, with whom petitioner had lived, of being interested and potentially biased towards petitioner (Trial Tr. at 529). Given the prosecution's argument at trial, respondent's claimed recent epiphany is impossible to credit.

June 19, or that Franklin had told Fernando that June 19 was the
date of the crime for which petitioner was arrested.  Moreover,
respondent's argument is applicable to any uncalled witness, and,
if accepted, all claims of ineffective assistance could never be
predicated on counsel's failure to call a witness.

     Respondent also argues that Fernando's 2004 hearing
testimony was unreliable because he failed to remember other
details, such as his conversations with Kaiser and Franklin, what
day of the week Seda was admitted to the hospital to give birth,
when John and Seda moved to Pennsylvania, when petitioner trav-
eled to and from Florida, and when petitioner was incarcerated in
Florida (Resp. Op. at 7-9).  Respondent's argument is unavailing.
Fernando's inability to recall those other details does not
necessarily mean Fernando's memory is flawed regarding June 19,
1996, the day before his first grandson was born.  Moreover,
since Fernando was not a close friend of petitioner, he would
have no reason to remember when petitioner traveled or was
incarcerated.  Fernando's inability to remember these details
does not excuse Kaiser's failure to communicate more fully with
Fernando and to produce him as a witness at petitioner's trial.

     Respondent argues that Chenoa Ruiz's testimony was also
completely cumulative because her testimony would have placed
petitioner at the same exact location during the same time
periods as John Torres and Jenine Seda (Resp. Op. at 9-10).

Chenoa testified, however, that she was not friends with peti-
tioner; to the contrary, Chenoa testified that she did not like
petitioner because she believed his presence was making things
more difficult for Seda during her pregnancy (Hrg. Tr. at 500-
03).  Thus, like Fernando Torres, Chenoa could not have been
impeached on the ground of bias, and her testimony would not have
been cumulative to that of John Torres and Jenine Seda.

        Respondent also makes several unpersuasive attempts to
discredit Chenoa.

        Respondent first argues that Chenoa was not credible
because although she recalled seeing petitioner on June 19, she
could not remember when petitioner traveled back and forth
between Florida and New York during his previous Florida trip,
and she did not know exactly when petitioner left Florida in the
end of June, 1996 (Resp. Op. at 10-12).  Chenoa testified that
she specifically recalled seeing petitioner at Seda's apartment
on June 19 because she took Seda to the doctor that day and
Seda's baby was born the following day (Hrg. Tr. at 548, 550).
In addition, Chenoa testified that she had heard only a few weeks
after June 19 that petitioner was arrested for a crime that
occurred that day (Hrg. Tr. at 506-07).  Hence, Chenoa's precise
memory of seeing petitioner on June 19 is explainable because
there were other significant events connected with that day and
the following day.  There were no other similar landmark events

52

in Chenoa's life to mark the other dates about which she was asked.  Thus I do not agree with respondent that Chenoa's 440 testimony was unreliable because she could not recall petitioner's whereabouts on dates other than June 19.

I also disagree with Respondent that the fact that petitioner sent a single letter to Chenoa during the eight years in which he was incarcerated shows that Chenoa was biased. Chenoa testified that when petitioner was in Florida, he became friendly with her infant children and their father, that petitioner wrote mainly to inquire about the children, and that petitioner's letter did not mention his case (Hrg. Tr. at 524). In addition, there is no evidence of any friendly relationship between petitioner and Chenoa prior to petitioner's trial. Respondent's allegation regarding petitioner's letter to Chenoa is not sufficient to conclude that petitioner ever had, let alone maintained, a close relationship with Chenoa.

Respondent also contends that Chenoa is unreliable because she had previously prepared a written statement that lacked some of the details she provided in her testimony, and merely stated that she knew petitioner was in Florida on June 19 because she saw him that day (Resp. Op. at 10).  The omission of details from Chenoa's written statement does not call her reliability into question.  There is no indication that anyone requested that Chenoa write a detailed statement that included

everything she could remember about petitioner on June 19.  Thus, there is no basis to conclude that, because she submitted a sparse written statement, Chenoa either lied or reconstructed details upon testifying at petitioner's 440 hearing.  See Victory v. Bombard, 570 F.2d 66, 70 (2d Cir. 1978) (statements witness made to a detective were not prior inconsistent statements merely because they omitted details disclosed by that witness' testimony).

No physical evidence was presented at petitioner's trial connecting petitioner to Collazo's murder; the prosecution relied solely on the eyewitness identifications of two individuals, Sanchez and Davis, neither of whom had ever met petitioner. Sanchez testified that he only saw petitioner for a minute, and Davis, who was about fifteen feet away from the shooting, appears to have witnessed the relevant events for only several seconds (Trial Tr. at 150, 53-58).  A third eyewitness, Jose Diaz, believed he would be able to recognize the perpetrator yet did not identify petitioner in court (Trial Tr. at 295-96).

Eyewitness evidence, uncorroborated by physical evidence, is not overwhelming evidence.  Griffin v. Warden, Maryland Correctional Adjustment Center, 970 F.2d 1355, 1359 (4th Cir. 1992) ("[e]yewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin thread to shackle a man for forty years.").  Eyewitness

identification by a stranger is even more susceptible to error
than identification by someone who is otherwise familiar with an
alleged perpetrator.  See Kampshoff v. Smith, 698 F.2d 581, 585
(2d Cir. 1983) ("The identification of strangers is proverbially
untrustworthy" quoting Felix Frankfurter, The Case of Sacco &
Vanzetti 30 (1927).).

     The addition of Fernando Torres and Chenoa Ruiz would
have presented the jury with a total of four alibi witnesses to
contradict the prosecution's two eyewitnesses, and Fernando and
Chenoa were substantially disinterested in the outcome of the
trial.[11]  "In a case involving identification and identification
alone, it is not easy to imagine a defense lawyer who would pass
on the chance to bolster the defense with [additional alibi

---

[11]None of the other five witnesses at petitioner's hearing,
or items of documentary evidence presented and described,
establish petitioner's presence in Florida on the day of the
shooting.  The failure to offer this evidence could not,
therefore, have prejudiced petitioner.  United States v. Luciano,
supra, 158 F.3d at 660-67 (to show prejudice from the failure of
counsel to call witnesses, petitioner must show that the uncalled
witnesses would have provided relevant testimony); Buitrago v.
Scully, 705 F.Supp. 952, 954 (S.D.N.Y. 1989) (counsel not
ineffective for failing to present alibi witness where petitioner
fails to show witness knew where petitioner was at the time of
the crime); United States v. Puco, 338 F. Supp. 1252, 1254
(D.C.N.Y. 1972) (witness' testimony that he was with the
defendant during the afternoon the day of the crime is not
relevant alibi evidence when the crime occurred in the evening).
Since the failure to call these witnesses and offer this evidence
could not have prejudiced petitioner, there is no need to address
whether counsel's failure to offer this evidence constituted
deficient performance.  Strickland v. Washington, supra, 466 U.S.
at 697.

witnesses] - particularly since eyewitness evidence is 'precisely the sort of evidence that an alibi defense refutes best.'"   <u>See Bigelow v. Williams</u>, <u>supra</u>, 367 F.3d at 576 <u>quoting</u> <u>Griffin v. Warden, Maryland Correctional Adjustment Center</u>, <u>supra</u>, 970 F.2d at 1359.

In light of the thin evidence presented by the prosecution at petitioner's trial, the additional alibi testimony from Fernando and Chenoa presented at petitioner's post-conviction hearing was sufficient to "undermine confidence in the outcome" of petitioner's trial.   <u>Strickland</u>, <u>supra</u>, 466 U.S. at 694.   Thus I find that petitioner has satisfied both prongs of <u>Strickland</u>. Nevertheless, I cannot conclude that the state court's holding to the contrary was an unreasonable application of, or contrary to, Supreme Court precedent.

> d.   Application of the
>       AEDPA Standard to
>       <u>Petitioner's Claim</u>

As discussed above, Justice Davidowitz rejected petitioner's ineffective assistance of counsel claim, applying New York State's "meaningful representation" standard as articulated by the New York Court of Appeals in <u>People v. Benevento</u>, <u>supra</u>, 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629.   This standard for analyzing claims of ineffective assistance of counsel "is ultimately concerned with the fairness of the process as a whole

rather than its particular impact on the outcome of the case."

People v. Benevento, supra, 91 N.Y.2d at 714, 697 N.E.2d at 588,

674 N.Y.S.2d at 633.   Petitioner argues that Justice Davidowitz's

application of the "meaningful representation" standard was both

contrary to, and an unreasonable application of Strickland (Pet.

Reply at 16).

        In his 440 Decision and Order, Justice Davidowitz

looked at a number of issues routinely considered by New York

courts in analyzing whether or not counsels' errors amounted to

ineffective assistance, such as did counsel perform competently

in other respects and were counsels' errors so seriously prejudi-

cial as to compromise a defendant's right to a fair trial (440

Order at 16-17, citing People v. Flores, 84 N.Y.2d 184, 639

N.E.2d 19, 615 N.Y.S.2d 662 (1994), People v. Aiden, 45 N.Y.2d

394, 380 N.E.2d 272, 408 N.Y.S.2d 444 (1978), and People v.

Adams, 12 A.D.3d 523, 783 N.Y.S.2d 867 (2d Dep't 2004)).   Justice

Davidowitz concluded that both attorneys filed all appropriate

motions, conducted an investigation that was "within the scope of

information" available to them, competently examined witnesses

and made competent opening and closing statements, and, "most

importantly, a credible alibi defense was presented to the jury"

(440 Order at 17).   Without specifically addressing the testimony

of Fernando Torres and Chenoa Ruiz, Justice Davidowitz then

concluded that the witnesses presented at the hearing were

"questionable" and "not as persuasive as [John Torres and Jenine Seda] who . . . were rejected by the jury" (440 Order at 21-22). Thus, Justice Davidowitz found that the outcome of petitioner's trial was "unimpeached and 'amply supported by the evidence'" (440 Order at 22, quoting People v. Jackson, 74 A.D.2d 585, 424 N.Y.S.2d 484 (2d Dep't 1980), aff'd, 52 N.Y.2d 1027, 420 N.E.2d 97, 438 N.Y.S.2d 299(1981)). Petitioner argues that Justice Davidowitz's "meaningful representation" analysis was contrary to Strickland (Pet. Mem. at 39).

The Second Circuit has repeatedly held that New York's "meaningful representation" standard for analyzing habeas claims of ineffective assistance of counsel, as articulated in People v. Benevento, supra, 91 N.Y.2d at 714, 697 N.E.2d at 588, 674 N.Y.S.2d at 633, is not contrary to Strickland. See Eze v. Senkowski, 321 F.3d 110, 122-23 (2d Cir. 2003); Lindstandt v. Keane, supra, 239 F.3d at 198. Nevertheless, petitioner argues that the Second Circuit's more recent opinion in Henry v. Poole, supra, 409 F.3d 48, "suggested that New York's 'flexible' focus on the overall fairness of the petitioner's trial might dilute Strickland's prejudice standard by requiring something more than a reasonable probability of a different outcome" (Pet. Mem. at 39, quoting Henry v. Poole, supra, 409 F.3d at 70-71). Specifically, the Court noted in Henry that

> in light of the Strickland principle that an ineffec-
> tive assistance claim is established if the court

58

> concludes that there is a reasonable probability that
> but for counsel's professionally deficient performance
> the outcome of the proceeding would have been differ-
> ent, we find it difficult to view so much of the New
> York rule as holds that "<u>whether defendant would have</u>
> <u>been acquitted of the charges but for counsel's errors</u>
> <u>is . . . not dispositive</u>," <u>Benevento</u>, 91 N.Y.2d at 714,
> . . . as not "contrary to" the prejudice standard
> established by <u>Strickland</u>.

<u>Henry v. Poole</u>, <u>supra</u>, 409 F.3d 71 (emphasis in original).

Several District Court decisions within the Circuit have con-

firmed that <u>Henry</u> does question the continuing vitality of the

Second Circuit prior decisions that found New York's "meaningful

representation" is not contrary to <u>Strickland</u>.  <u>Acencio v.</u>

<u>McKinney</u>, 05-CV-1026 (NGG), 2007 WL 2116253 at *14 n.20;

(E.D.N.Y. July 20, 2007); <u>Remy v. Graham</u>, 06 CV 3637 (JG), 2007

WL 496442 at *5 (E.D.N.Y. Feb. 12, 2007); <u>Baskerville v.</u>

<u>Dennison</u>, 04 Civ. 10261 (PKC), 2005 WL 3535067 at *6 (S.D.N.Y.

Dec. 27, 2005).  Nevertheless, the panels in both <u>Henry</u>, <u>supra</u>,

409 F.3d at 70, and <u>Eze v. Senkowski</u>, 321 F.3d 110, 124 (2d Cir.

2003), expressly noted that, in the absence of an intervening

Supreme Court or <u>en banc</u> Circuit decision, they were "bound" by

the Circuit's precedents holding that New York's "meaningful

representation" standard was not contrary to <u>Strickland</u>.  Given

that the Second Circuit has expressly found itself bound by these

precedents, it would be clearly improper for me to conclude that

I had greater discretion than the Court with the authority to set

the law for the Circuit.  Accordingly , I am bound by precedent

to conclude that the "meaningful representation" standard is not contrary to Strickland.  Nevertheless, I will consider petitioner's arguments that Justice Davidowitz's analysis of petitioner's ineffective assistance of counsel claim was contrary to Strickland, as doing so would not affect the outcome of this case.

Petitioner argues that Justice Davidowitz's analysis was contrary to Strickland because his opinion emphasized that Hartsfield and Kaiser's misunderstandings regarding the granting of expenses to investigate were unintentional errors.  Petitioner contends this "honest heart" standard imposes a heavier burden on petitioner than Strickland's "reasonable professional" standard because it requires petitioner to demonstrate that trial counsel had an improper motive for his or her objectively deficient performance (Pet. Mem. at 39-40, citing Cargle v. Mullin, 317 F.3d 1196, 1204-05 (10th Cir. 2003).  I disagree with petitioner that Justice Davidowitz's opinion petitioner placed such a burden on petitioner.  Unlike the petitioner in Cargle, petitioner here was not required to establish why his counsel failed to find and present additional witnesses or evidence at his trial.  Cargle v. Mullin, supra, 317 F.3d at 1205.  Justice Davidowitz's opinion does not suggest that petitioner was required to show anything more than what Strickland requires:  that his counsel were deficient and that because of such deficiency the outcome of his

60

trial might have been different.  Justice Davidowitz's opinion
discussed the positive aspects of counsels' performance and
counsels' "integrity" to support his conclusion that petitioner
received a fair trial; he did not deny petitioner's motion for
failing to establish that Kaiser and Hartsfield had improper
motives.  Hence, Justice Davidowitz's emphasis on counsel's lack
of bad intentions was not contrary to, nor was it an unreasonable
application of, the Strickland standard.

        Petitioner also argues that Justice Davidowitz's
opinion was contrary to Strickland because it relied on a formu-
lation of prejudice that precludes relief where the verdict was
"amply supported by the evidence" (440 Order at 22, quoting
People v. Jackson, supra, 74 A.D.2d at 587, 424 N.Y.S.2d at 485),
and that such a standard is diametrically different from  Strick-
land's requirement that a petitioner show only a reasonable
probability of acquittal had counsel performed adequately (Pet.
Mem. at 40).  When referring to People v. Jackson, supra, 74
A.D.2d at 587, 424 N.Y.S.2d at 485, Justice Davidowitz was not
saying petitioner's motion should be denied simply because there
was ample evidence in support of petitioner's guilt.  Rather, he
was merely taking into consideration the strength of respondent's
case in reaching his conclusion.  Consideration of the strength
of the prosecution's case is completely appropriate under Strick-
land v. Washington, supra, 466 U.S. at 696 ("[A] verdict or

conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); Baskerville v. Dennison, supra, 2005 WL 3535067 at *10 ("In assessing the question of prejudice, the Court must take into account the totality of the evidence before the trial court.").  It was not contrary to or an unreasonable application of Strickland for the state court to find the prosecution's case was sufficiently strong that a jury verdict would have been the same if petitioner had presented additional alibi witnesses.

Petitioner also contends that Justice Davidowitz unreasonably applied Strickland by focusing on counsels' compe- tent performance in other areas while assessing whether counsel was ineffective for failing to adequately investigate the alibi defense (Pet. Mem. at 42).  Petitioner argues that the Court in Henry v. Poole, supra, 409 F.3d at 72, "noted that when the New York Court of Appeals emphasized 'counsel's competency in all other respects' in determining 'meaningful representation,' it was failing to apply the Strickland standard "'at all'" (Pet. Mem. at 39, citing Henry v. Poole, 409 F.3d at 72).  However, the Henry court did not fault the New York Court of Appeals for emphasizing counsel's competency; the Court faulted it for "it's reliance" on counsel's competent performance in ways that were not the subject of the ineffectiveness claims.  Henry v. Poole, supra, 409 F.3d at 72 (emphasis added).  I disagree with peti-

62

tioner's contention that Justice Davidowitz found that "counsel's competency in some areas of their legal representation [can] compensate for significant deficiencies in other areas" (Pet. Reply at 17).  Rather, Justice Davidowitz looked at counsel's performance as a whole, including the alibi evidence that was presented at trial, to reach his conclusion that petitioner failed to demonstrate that further investigation in Florida could have resulted in a different jury verdict.   In Strickland terms, Justice Davidowitz held that petitioner failed to show he was prejudiced by counsels' deficiencies -- a conclusion which, if reasonable, is sufficient by itself to deny habeas relief. Strickland v. Washington, supra, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . . that course should be followed.").  Although I would reach a different result if the matter were before me for de novo review, the evidence is not so one-sided that Justice Davidowitz's conclusion can be characterized as unreasonable.  Hence I do not find that the state court's consideration of the totality of counsel's performance to have been contrary to or an unreasonable application of Strickland.

e.   <u>Summary</u>

Accordingly, despite the merits of petitioner's inef-
fective assistance of counsel claim, I conclude that the state
court's rejection of petitioner's claim is erroneous but not
"unreasonable" or "contrary to" the United States Supreme Court's
precedent in <u>Strickland</u>.   Thus, in light of the deference owed to
the state's decision under AEDPA, petitioner's claim for relief
based on the ineffective assistance of counsel should be denied.

2.   Petitioner's
<u>Batson Claim</u>

Petitioner next claims that the prosecutor's use of her
first six peremptory challenges to strike African-American jurors
established a <u>prima facie</u> case of racial discrimination, and that
the Trial Court erred by failing to require the prosecutor to
provide race-neutral explanations for her choices as required by
<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).   Petitioner further
argues that the Appellate Division's rejection of his <u>Batson</u>
challenge was an unreasonable application of the Supreme Court's
precedent.

a.   Jury Selection and
<u>State Court Proceedings</u>

The twelve jurors and three alternate jurors who heard
the case against petitioner were selected through three rounds of

voir dire.  Because New York classifies murder as a Class A
felony, both the prosecution and defense had twenty peremptory
challenges, exclusive of challenges to potential alternate
jurors.  N.Y. Crim. Proc. L. § 270.25(a).  It appears from the
record that the jury was selected using the "jury box" system,
commonly used in criminal trials in New York.  Under this system,
groups of prospective jurors, randomly selected from the venire,
are called to the jury box and questioned.  Counsel then exercise
challenges for cause.  After "for cause" challenges are resolved,
counsel exercise their peremptory challenges.  The process is
repeated until a jury is empaneled.  See generally Sorto v.
Herbert, 497 F.3d 163, 166 (2d Cir. 2007) (describing "jury box"
selection system).

        During the first round of jury selection in peti-
tioner's case, sixteen venire persons were called to the jury
box.  Two were removed on consent (Jury Tr.[12] I at 88).  After an
unsuccessful challenge to one prospective juror for cause (Jury
Tr. I at 90-92), the prosecution exercised four peremptory
challenges, including a challenge to the prospective juror who
was unsuccessfully challenged for cause (Jury Tr. I at 91).  The
defense exercised two peremptory challenges (Jury Tr. I at 92-
93), and the remaining eight individuals were sworn in as jurors
(Jury Tr. I at 94).

---

        [12]"Jury Tr." refers to the transcript of jury selection
proceedings in petitioner's case.

In the second round of jury selection, seventeen individuals were called to the jury box (Jury Tr. I at 100-02). After four of these individuals were excused on consent (Jury Tr. I at 156-60), Justice Fisch asked counsel if they had any peremptory challenges as to the first four prospective jurors remaining in the second round (Jury Tr. I at 160). The prosecution challenged one of those four, and then the defense challenged two of them (Jury Tr. I at 161). Justice Fisch then invited counsel to exercise their peremptory challenges with regards to the next three jurors (Jury Tr. at 161). The prosecution challenged one of those three individuals (Jury Tr. I at 161).

At that point, the following colloquy occurred:

[Defense Counsel:]    Judge, most respectfully, and I hate to do it, but it's reached the point now where I notice a pattern of challenges that are consistent only by one factor and that's the race of the person that's being challenged, all of whom are black. Every single one of them.

    Now, granted this is the Bronx and there's a lot of black jurors and there's a couple or a few that she didn't take off, but the ones that she did take off without exception are Afr[ican]Americans.

THE COURT:    Let['s] see if there is a pattern.

(Whereupon, there is a brief pause in the proceedings.)

THE COURT:    I do not see a prima faci[e] case of exercised peremptory challenges by race. The People have exercised six peremptories of Afr[ican-]Americans and there were four that were not challenged

66

```
                              by her, three of whom are jurors, one of
                              them whom you challenged.  I deny your
                              challenge.

[Defense Counsel:]   All right.


                              *     *     *

THE COURT:           As a matter of fact, I should say that
                     five [African-Americans] were not chal-
                     lenged.  Six were challenged, five were
                     not.

[Defense Counsel:]   Yeah, but I don't think -- it's not
                     necessarily who['s] not challenged.  I
                     think it is who is challenged.

THE COURT:           All right, that's my ruling.  I do not
                     see a prima faci[e] case.
```

(Jury Tr. I at 161-63).

Defense counsel never raised any additional arguments concerning the prosecution's use of its peremptory challenges. The prosecution subsequently exercised four more peremptory challenges in the remainder of the second round and during the third round of jury selection (Jury Tr. I at 168, Jury Tr. II at 84-87).  The record does not reflect the race of any of the subsequently challenged venire persons or the final racial make-up of the jury.

Petitioner argued on direct appeal that the prosecution's use of its first six peremptory challenges exclusively against African-Americans established a prima facie case of discrimination under Batson, and that the prosecution should have been required to provide race-neutral reasons for its challenges

67

(App. Div. Br. at 46-49).  The Appellate Division rejected

petitioner's arguments, stating:

> Defendant failed to make a prima facie showing of
> racial discrimination by the prosecution in the exer-
> cise of its peremptory challenges, particularly in
> light of the racial makeup of the panel of prospective
> jurors (see, People v Ware, 245 AD2d 85, lv denied 91
> NY2d 978).  The mere number of peremptory challenges
> exercised by the prosecution against African-Americans
> did not establish a prima facie case and defendant
> failed to show disparate treatment of similarly situ-
> ated panelists or other relevant circumstances to raise
> an inference of a discriminatory purpose (see, People v
> Jenkins, 84 NY2d 1001; People v Bolling, 79 NY2d 317).

People v. Rosario, supra, 288 A.D.2d at 143, 733 N.Y.S.2d at 406-

07.

      The Appellate Division's decision clearly constitutes a

decision on the merits of petitioner's Batson.  It addresses the

substance of the claim and does not remotely suggest any proce-

dural deficiency.  Accordingly,  the Appellate Division's deci-

sion is entitled to the deferential standard of review set forth

in the AEDPA, and relief can be granted only if the Appellate

Division's decision was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by

the Supreme Court of the United States."  28 U.S.C. § 2254; Sorto

v. Herbert, supra, 497 F.3d at 169.

      b.   Analysis

      In Batson v. Kentucky, supra, 476 U.S. at 79, the

Supreme Court held that a prosecutor may not use peremptory

challenges to discriminate against potential jurors along racial
lines.  "[T]he Equal Protection Clause forbids the prosecutor to
challenge potential jurors solely on account of their race or on
the assumption that black jurors as a group will be unable
impartially to consider the State's case against a black defen-
dant."  Batson v. Kentucky, supra, 476 U.S. at 89.

The Batson Court formulated a three-part test "for
assessing a prima facie case under the Equal Protection Clause."

> The Batson Court . . . establish[ed] a three-step
> burden-shifting framework for the evidentiary inquiry
> into whether a peremptory challenge is race-based, [476
> U.S.] at 96-98, 106 S.Ct. 1712:  First, the moving
> party -- i.e., the party challenging the other party's
> attempted peremptory strike -- must make a prima facie
> case that the nonmoving party's peremptory is based on
> race.  Batson, 476 U.S. at 96-97, 106 S.Ct. 1712;
> Hernandez v. New York, 500 U.S. 352, 358, 111 S.Ct.
> 1859, 114 L.Ed.2d 395 (1991).  Second, the nonmoving
> party must assert a race-neutral reason for the peremp-
> tory challenge.  Batson, 476 U.S. at 97-98, 106 S.Ct.
> 1712; Hernandez, 500 U.S. at 358-59, 111 S.Ct. 1859.
> The nonmoving party's burden at step two is very low.
> Under Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769,
> 131 L.Ed.2d 834 (1995) (per curiam), although a race-
> neutral reason must be given, it need not be persuasive
> or even plausible.  Id. at 768, 115 S.Ct. 1769.  Fi-
> nally, the court must determine whether the moving
> party carried the burden of showing by a preponderance
> of the evidence that the peremptory challenge at issue
> was based on race.  Batson, 476 U.S. at 96, 98, 106
> S.Ct. 1712;  Hernandez, 500 U.S. at 359, 111 S.Ct.
> 1859.

McKinney v. Artuz, 326 F.2d 87, 97098 (2d Cir. 2003) (footnote
omitted); accord Sorto v. Herbert, supra, 497 F.3d at 169-70;
Frazier v. New York, 187 F. Supp.2d 102, 114 (S.D.N.Y. 2002),
aff'd mem., 156 Fed. Appx. 423 (2d Cir. 2005).

"To establish a prima facie case, 'a defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors from the petit jury on account of their race.'" Sorto v. Herbert, supra, 497 F.3d at 170, quoting Overton v. Newton, 295 F.3d 270, 276 (2d Cir. 2002).  The burden of making a prima facie showing under a Batson challenge is not onerous and is analogous to the burden borne by the plaintiff in a Title VII case to make out a prima facie case under the McDonnell Douglas test.  See Truesdale v. Sabourin, 427 F. Supp.2d 451, 458-59 (S.D.N.Y. 2006); see also Williams v. Bruge, supra, 2005 WL 2429445 at *5 ("[A] prima facie case under Batson demands only a 'minimal burden' from the claimant.").  The party asserting the challenge need not show that it is more likely true than not that discrimi-natory animus underlies the adversary's conduct; all that need be shown to establish a prima facie case is "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, 545 U.S. 162, 170 (2005).

There is no formula for determining what showing is sufficient to establish a prima facie case of discriminatory use of peremptory challenges.  Tankleff v. Senkowski, 135 F.3d 235, 249 (2d Cir. 1998).  Rather,

> [i]n deciding whether the defendant has made the requi-
> site [prima facie] showing, the trial court should
> consider all relevant circumstances.  For example, a
> "pattern" of strikes against all black jurors included

> in the particular venire might give rise to an infer-
> ence of discrimination.  Similarly, the prosecutor's
> questions and statements during <u>voir</u> <u>dire</u> examination
> and in exercising his challenges may support or refute
> an inference of discriminatory purpose.  These examples
> are merely illustrative.

<u>Batson v. Kentucky</u>, <u>supra</u>, 476 U.S. at 96-97; <u>accord</u> <u>Overton v.</u>
<u>Newton</u>, <u>supra</u>, 295 F.3d at 277-78; <u>see</u> <u>Isaac v. Greiner</u>, 01 Civ.
2178 (PKC), 2005 WL 1713036 at *5 (S.D.N.Y. July 19, 2005).

     "[T]he threshold decision concerning the existence of a
<u>prima facie</u> case of discriminatory use of peremptory challenges
involves both issues of fact and an issue of law."  <u>United States</u>
<u>v. Alvarado</u>, 891 F.2d 439, 443 (2d Cir. 1989), <u>vacated</u> <u>on</u> <u>other</u>
<u>grounds</u>, 497 U.S. 110 (1990).  Where the state courts have issued
a decision on the merits concerning the existence of a <u>prima</u>
<u>facie</u> case, that decision is entitled to the deferential standard
of review set forth in the AEDPA.  <u>Overton v. Newton</u>, <u>supra</u>, 295
F.3d at 277.  Thus, a prisoner challenging the trial court's
resolution of a <u>Batson</u> challenge through a habeas corpus petition
has to overcome a "presumption of correctness":

> We review a district court's ruling on a petition for a
> writ of habeas corpus <u>de</u> <u>novo</u>. <u>See</u> <u>English v. Artuz</u>,
> 164 F.3d 105, 108 (2d Cir. 1998).  Because a trial
> court's determination of whether a juror was struck for
> a discriminatory reason turns largely on the judge's
> observations of the attorneys and prospective jurors
> and an evaluation of their credibility, "a reviewing
> court ordinarily should give those findings great def-
> erence."  <u>Hernandez v. New York</u>, 500 U.S. 352, 364, 111
> S.Ct. 1859, 114 L.Ed.2d 395 (1991).  More particularly,
> when reviewing a <u>Batson</u> challenge in the context of a
> habeas petition, a trial court's conclusion that a
> peremptory challenge was not exercised in a discrimina-

> tory manner is entitled to a presumption of correct-
> ness, except, <u>inter</u> <u>alia</u>, to the extent that the trial
> court did not resolve the factual issues involved in
> the challenge or if the finding is not fairly supported
> by the record. <u>See</u> 28 U.S.C. §§ 2254(d)(1) (presump-
> tion of correctness not applicable if "the merits of
> the factual dispute were not resolved in the State
> court hearing") and (d)(8) (1994) (presumption of cor-
> rectness not applicable if state court's "factual de-
> termination is not fairly supported by the record");
> <u>see</u> <u>also</u> <u>Purkett v. Elem</u>, 514 U.S. 765, 769, 115 S.Ct.
> 1769, 131 L.Ed.2d 834 (1995) ("[T]he factual findings
> of state courts are presumed to be correct, and may be
> set aside, absent procedural error, only if they are
> not fairly supported by the record.") (internal quota-
> tion marks omitted); <u>Washington v. Schriver</u>, 240 F.3d
> 101, 110 (2d Cir. 2001) (stating that the factual find-
> ings of state trial and appellate courts are entitled
> to a presumption of correctness absent special circum-
> stances, including a determination that the factual
> finding is not fairly supported by the record).

<u>Galarza v. Keane</u>, <u>supra</u>, 252 F.3d at 635 (footnote omitted).  The

burden is on petitioner to rebut the trial court's presumption of

correctness by clear and convincing evidence.  <u>Williams v. Burge</u>,

04 Civ. 2590 (PKC), 2005 WL 2429445 at *3 (S.D.N.Y. Oct. 3,

2005), <u>quoting</u> <u>Parsad v. Greiner</u>, 337 F.3d 175, 181 (2d Cir.

2003).  Hence, "[a] federal court reviewing a state court deter-

mination that no <u>prima</u> <u>facie</u> [case] existed must accord substan-

tial deference to that determination." <u>Williams v. Burge</u>, <u>supra</u>,

2005 WL 2429445 at *3.

     In light of the deferential standard of review afforded

to state court decisions in the context of a habeas corpus peti-

tion, the Court of Appeals seems to have suggested that a finding

on a direct appeal in a federal criminal case that a particular

set of facts supports a Batson prima facie case does not neces-
sarily imply that a state court's decision reaching the opposite
result on the same facts is contrary to or constitutes an unrea-
sonable application of federal law.  Sorto v. Herbert, supra, 497
F.3d at 172; Overton v. Newton, supra, 295 F.3d at 280 n.12.

Finally, since the petitioner in a habeas proceeding
bears the burden of demonstrating a violation of his constitu-
tional rights, deficiencies in the record that make it impossible
to determine whether the evidence supports an inference of dis-
crimination require that the claim be rejected.  Sorto v. Her-
bert, supra, 497 F.3d at 172-73.

Petitioner contends that he made out a prima facie case
under Batson because the prosecution's use of peremptory chal-
lenges against African-Americans was grossly disproportionate to
the percentage of African-Americans who made up the pool of
prospective jurors after challenges for cause and after jurors
had been excused on consent.  Specifically, at the time the
Batson challenge was made, a total of 33 prospective jurors had
been called to be questioned; a total of six had been excused on
consent; and the Trial Court had invited counsel to exercise
peremptory challenges against a total of 21 prospective jurors.[13]

---

[13]In the first round, the Trial Court invited counsel to
exercise their peremptory challenges against all 14 prospective
jurors who remained after two were excused on consent.  In the
second round, the Trial Court subdivided the prospective jurors
into a group of four and then a group of three.  Petitioner made
(continued...)

The prosecution made peremptory challenges directed at six African-Americans; the Trial Court noted that there were five African-Americans who the prosecution did not challenge. Thus, of the 21 prospective jurors against whom the prosecution could have made peremptory challenges, 11, or 52%, were African-Americans, yet 100% of the prosecution's peremptory challenges were directed at African-Americans.

Analogous facts were presented in United States v. Alvarado, 923 F.2d 253 (2d Cir. 1991) in which the prosecution exercised its peremptory challenges against two African-American prospective jurors, two white prospective jurors and one Hipanic prospective juror. The prosecution waived its sixth peremptory challenge. In addition, the prosecution used the one peremptory challenge it had for alternate jurors to strike an African American. United States v. Alvarado, supra, 923 F.2d at 255.

After assuming that minorities represented 29% of the pool of prospective jurors, the Court of Appeals found that the pattern of peremptory challenges "strongly support[ed] a prima facie case under Batson:"

> Here, the prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for

---

[13](...continued)
his Batson challenge after peremptories directed at the group of three were made. See pages 64-65, above.

example, if the minority percentage of the venire was
50, it could be expected that a prosecutor, acting
without discriminatory intent, would use 50 percent of
his challenges against minorities.  Only a rate of
minority challenges significantly higher than the mi-
nority percentage of the venire would support a statis-
tical inference of discrimination.  We are not informed
of the minority percentage of the venire in this case,
but we may accept as a surrogate for that figure the
minority percentage of the population of the Eastern
District, from which the venire was drawn.  That per-
centage is 29.  See Alvarado I, 891 F.2d at 444 & n.5.

We think a challenge rate nearly twice the likely
minority percentage of the venire strongly supports a
prima facie case under Batson.  The Government opposes
this conclusion, pointing to the prosecution's waiver
of a challenge in the fifth round, when minority
veniremen were in the jury box, subject to peremptory
challenge.  Though failure to exercise an available
challenge against minority veniremen has been mentioned
in the decisions of some courts finding no prima facie
case of discrimination, see United States v. Moore, 895
F.2d 484, 486 n. 5 (8th Cir. 1990); United States v.
Grandison, 885 F.2d 143, 148 (4th Cir. 1989), cert.
denied, 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507
(1990), the fifth round waiver here does not defeat a
prima facie case.  The discrimination condemned by
Batson need not be as extensive as numerically possi-
ble.  A prosecutor may not avoid the Batson obligation
to provide race-neutral explanations for what appears
to be a statistically significant pattern of racial
peremptory challenges simply by forgoing the opportu-
nity to use all of his challenges against minorities.

923 F.2d at 256.  See also Overton v. Newton, supra, 295 F.3d at

278 ("[W]e have no doubt that statistics, alone and without more,

can, in appropriate circumstances, be sufficient to establish the

requisite prima facie showing under Batson.").

Similarly, in Truesdale v. Sabourin, 427 F. Supp.2d 451

(S.D.N.Y. 2006), 19 individuals made up the panel of prospective

jurors, 14 of whom were African-Americans.  As of the time the

Batson challenge was made, the prosecution had exercised eight peremptory challenges, all of which were directed at African-Americans.  The Trial Court concluded that these statistics were insufficient to establish a prima facie case under Batson.  427 F. Supp.2d at 454-55, and the Appellate Division affirmed the Trial Court's conclusion on direct appeal.

The prisoner then filed a petition for a writ of habeas corpus in this Court.  After noting that the burden at the initial step of Batson is not a significant one, the Honorable Denise L. Cote, United States District Judge, concluded that petitioner had made a prima facie case of a Batson violation.

> When a defendant relies on statistical arguments to establish a prima facie case of discriminatory jury selection, "a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." Alvarado, 923 F.2d at 255.  At the time the Batson challenge was made in this case, the rate of challenges against black members of the venire was 100% (8/8), and the percentage of blacks in the venire was 74% (14/19). Black prospective jurors were thus struck at a rate 36% higher than would be expected if peremptory challenges were exercised randomly across the venire.  To be sure, this disparity is far below the greater than 100% difference relied upon by the Second Circuit in Alvarado, id. at 256, but that case did not purport to, and should not be read to, establish a minimum threshold for prima facie claims of discrimination.  Were it otherwise, no inference of discrimination would be
>
> possible where members of the targeted group compose more than 50% of the venire.

427 F. Supp.2d at 461.

In this case, as in both <u>Alvarado</u> and <u>Truesdale</u>, the prosecution used 100% of the peremptory challenges actually exercised up to the time of the <u>Batson</u> challenge to strike only African-American prospective jurors despite the fact that African-American prospective jurors made up a significantly smaller percentage of the pool of prospective jurors. Here, that percentage was 52% (11 out of 21). <u>Alvarado</u> teaches that this disparity is sufficient to trigger the prosecution's obligation to proffer racially neutral reasons for its challenges.

In support of his position, respondent cites to a number of facts and cases; none of his arguments are convincing.

Like the Trial Court, respondent cites the fact that a number of African-Americans were not challenged (Resp. Op. at 47-48). <u>Alvarado</u>, however, expressly rejected this argument:

> The discrimination condemned by <u>Batson</u> need not be as extensive as numerically possible. A prosecutor may not avoid the <u>Batson</u> obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by foregoing the opportunity to use all of his challenges against minorities.

<u>United States v. Alvarado</u>, <u>supra</u>, 923 F.2d at 256. Moreover, this argument misses the point of <u>Batson</u>. <u>Batson</u> was intended, among other things, to prohibit the use of a race as a factor in jury selection, regardless of whether a minority is entirely excluded from the jury or the number of minority jury members is merely limited. See <u>Walker v. Girdich</u>, 410 F.3d 120, 123 (2d

77

Cir. 2005) ("[U]nder Batson and its progeny, striking even a single juror for a discriminatory purpose is unconstitutional."); accord Green v. Travis, 414 F.3d 288, 297 (2d Cir. 2005); United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994) (stating that "[t]o establish a prima facie case, [the defendant] did not need to show that the prosecution had engaged in a pattern of discriminatory strikes against more than one prospective juror. We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose."); Jones v. Ryan, 987 F.2d 960, 972 (3d Cir. 1993) (noting that the striking of even a single juror based on race violates the Constitution); Reyes v. Greiner, 340 F. Supp.2d 245, 266 (E.D.N.Y. 2004) ("[I]t is settled law that a Batson violation occurs where the prosecution or the defendant has been found to have struck a single juror on the basis of race, even where the prosecution or the defendant waived peremptory challenges, leaving other persons of that race on the jury." (citations omitted)).

        Next, respondent argues that the result in this case should be governed by the decisions in Overton v. Newton, supra, 295 F.3d 270 and Williams v. Burge, supra, 2005 WL 2429445 (Resp. Op. at 45-48).  Although these cases have some similarity to this case, I conclude that they are both distinguishable and not controlling.

78

In Overton the Second Circuit rejected a claim by a habeas petitioner that a state trial judge had incorrectly concluded there was no prima facie case under Batson.  The petitioner in Overton made his Batson challenge after two rounds of jury selection and after the prosecution had exercised peremptory challenges against seven of the eleven African-Americans potential jurors and three against non-African-Americans.  295 F.3d at 273-74.  The Batson challenge was not renewed at the conclusion of jury selection, and the record did not reveal what the actual composition of the jury was.  Overton v. Newton, supra, 295 F.3d at 279.  The Court of Appeals found that the record before it did not establish an unreasonably erroneous decision by the Trial Court, stating:

> Here, the prosecutor used four peremptory challenges in the first round of jury selection and struck two of five African-American potential jurors from the venire.  Three African-American jurors were seated.  In the second round, there were six African-American potential jurors in the box; one was struck for cause and the other five were excluded as a result of peremptory strikes by the prosecutor.  At this point, before jury selection was completed and before the above facts were even fully established on the record, petitioner made his Batson challenge.  It was at this stage that the trial court denied it; we cannot say that, in doing this, it unreasonably applied the Batson principle.

295 F.3d at 279.

In Williams, during the first round of jury selection, the prosecutor had used his first five peremptory challenges against African-American potential jurors when the defendant made

a Batson motion.  The trial judge found that the motion was
premature at that point, stating:

> I quite frankly feel that a prima facie case has not
> been made out. . . .  Not at this point.  [Five strikes
> is] not enough, in my judgment, to require the People
> to present me with non-contextual [sic].  It may be
> when we concluded the selection process for the first
> 17 that I will revisit the issue, but right now, no.

2005 WL 2429445 at *1.  The first round of jury selection then
continued, and the prosecutor exercised three additional peremp-
tory challenges, all of which were directed at non-African-Ameri-
can potential jurors.  Williams v. Burge, supra, 2005 WL 2429445
at *2

Your Honor concluded that the Trial Judge's determina-
tion that no prima facie Batson claim had been established was
not an unreasonable application of federal law.  Williams v.
Burge, supra, 2005 WL 2429445 at *6-7.  Although your Honor
expressed skepticism concerning whether denial of a Batson claim
prior to the conclusion of jury selection could ever constitute
an unreasonable application of federal law, this does not appear
to have been the basis for the decision.  Williams v. Burge,
supra, 2005 WL 2429445 at *6.  Rather your Honor distinguished
Williams's claim from Green v. Travis, supra, 414 F.3d 288 and
from Batson itself on the ground that not all of the peremptory
claims exercised by the prosecution were directed at minorities
and the challenges were not used to eliminate an entire minority
from the jury.  Williams v. Burge, supra, 2005 WL 2429445 at *6.

80

I conclude that both <u>Overton</u> and <u>Williams</u> are distinguishable because in neither case did the prosecution direct its peremptory challenges solely at African-Americans, as the prosecutor did in this case.  Moreover, nothing in <u>Overton</u> suggests that the Court of Appeals intended to overrule <u>Alvarado</u>, which unequivocally held that a disproportionate use of peremptory challenges against a minority can satisfy the requirement of a <u>prima facie</u> case under <u>Batson</u>.  Although I appreciate that the Court of Appeals has repeatedly noted that <u>Batson</u> claims raised in habeas petitions are entitled to more lenient review than similar claims raised on direct appeals from federal convictions, the rate of challenge here -- 100% of the challenges exercised against a minority group that made up only 52% of the panel -- was sufficiently disparate to at least require the prosecution to proffer a racially neutral reason for its challenges.

Finally, respondent also offers hypothetical racially-neutral reasons for the prosecution's peremptory challenges (Resp. Op. at 52-53).  Such after-the-fact suggestions are insufficient to remedy a <u>Batson</u> violation.  "A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."  <u>Miller-El v. Dretke</u>, 545 U.S. 231, 252 (2005); <u>accord Rogers v.</u>

81

<u>Artuz</u>, 00 Civ. 2718 (JBW), 03 Misc. 0066 (JBW), 2007 WL 2815692 at *6 (E.D.N.Y. Sep. 24, 2007).

The prosecutor's disproportionate strikes of black jurors, despite the fact that not all blacks were stricken from the jury, was sufficient to raise an inference of discrimination and, therefore, sufficient to establish a <u>prima</u> <u>facie</u> case under <u>Batson</u>.  Thus, the Trial Court erred in not requiring the prosecutor to offer race-neutral reasons for her peremptory challenges and the appellate divisions' finding otherwise was an unreasonable application of clearly established federal law.

    c.   <u>Relief</u>

There are three options available to a court in fashioning a remedy for a petitioner's successful habeas claim based on a state court's <u>Batson</u> rulings.

> When a state court fails to fulfill its duties under <u>Batson</u>, a federal court sitting in habeas review has three options in its selection of a remedy.  The federal court may "(1) hold a reconstruction hearing and take evidence regarding the circumstances surrounding the prosecutor's use of the peremptory challenges . . .; (2) return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own; or (3) order a new trial." <u>Harris</u>, 346 F.3d at 347 (citation omitted).  There are some limits, however, to the district court's discretion to choose among these remedial options.  Most importantly, the Second Circuit has cautioned that "if appropriate findings may be conveniently made" at a reconstruction hearing, "this should be done." <u>Id</u>. at 348 (citation omitted).  Thus, a district court has the discretion to order a new trial "only where it is demonstrably true that the passage of

> time has impaired the trial court's ability to make a
> reasoned determination of the prosecutor's state of
> mind when the jury was selected." <u>Id</u>. (citation omit-
> ted).

<u>Truesdale v. Sabourin</u>, <u>supra</u>, 427 F. Supp.2d at 462, <u>see</u> <u>also</u>

<u>Tankleff v. Senkowski</u>, 3 F. Supp.2d 278, 280 (E.D.N.Y. 1998).

Despite the fact that approximately nine years have

passed since petitioner's trial, respondent reports that the

prosecution is still capable of presenting its reasons for its

peremptory challenges at a reconstruction hearing (Resp. Op. at

56-57).

Accordingly, I respectfully recommend that the writ be

granted on the basis of petitioner's <u>Batson</u> claim unless, within

ninety (90) days of the final resolution of this matter, the New

York courts conduct a reconstruction hearing concerning the

prosecution's non-discriminatory reasons for the exercise of its

peremptory challenges.

            3.   Prosecutor's Introduction
                 of Extrinsic Evidence that
                 <u>Petitioner Was Incarcerated</u>

Petitioner next claims that his Due Process rights were

violated by the prosecution's introduction of extrinsic evidence

that petitioner was incarcerated in Florida for a period of time

several months before the day of the crime charged (Pet. Mem. at

49).  Petitioner argues that not only was the introduction of

this evidence in violation of New York state's evidentiary rules,

83

but resulted in a "highly prejudicial inference of criminal
propensity" that denied petitioner the right to a fair trial
(Pet. Mem. at 49).

        a.    <u>The Trial Testimony</u>

      Petitioner testified on his direct examination that he
first met alibi witness John Torres during a two-week visit to
Florida in December, 1995 (Trial Tr. at 379-80).  Petitioner
returned to Florida in January or February of 1996 in the hopes
of getting a job with John's father (Trial Tr. at 381).  Al-
though, petitioner was unable to obtain work with John's father,
he stayed in Florida at the house of a female friend until mid-
April  (Trial Tr. at 382-84).  When asked why he stayed in
Florida until April when he had no job, petitioner responded that
"honestly I was enjoying being out there . . . . I was having a
good time out there" (Trial Tr. at 384).  Petitioner further
testified that he left Florida in April because he missed his
children in New York (Trial Tr. at 384).

      On cross-examination, petitioner testified more specifi-
cally regarding his living situation during his trip to Florida
from February to April.  Petitioner stated that every day,
throughout that entire trip, he stayed with his friend, Shannon
Beane, until he left for New York in mid-April (Trial Tr. 394-
98).

Over defense counsel's objection, the prosecution presented as a rebuttal witness Captain Bruce Bolton of the Volusia County Department of Correction, who testified that petitioner was housed at the Volusia County Department of Corrections from March 13, 1996 until April 12, 1996 (Trial Tr. at 439). The Trial Judge also allowed the introduction of petitioner's Florida arraignment photograph (Trial Tr. 452-54). No evidence was presented regarding the reason for petitioner's incarceration, or the disposition of the Florida case (Pet. Mem. at 50). In addition the jury was not advised that petitioner disclosed the fact of his incarceration in Florida in his written, post-arrest statement (Post-Arrest Stmnt.).

During its summation, the prosecution argued that petitioner should not be believed because he had lied to the jury about his incarceration in Florida, and was, therefore, willing to lie to the jury about his alibi for the day of the murder (Trial Tr. at 535-38). The Trial Judge subsequently instructed the jury that Captain Bolton's testimony was not offered to show guilt or that petitioner has a predisosition to commit crimes, but should be used "only in determining the credibility of witnesses who have appeared before you" (Trial Tr. at 565).

b.   Exhaustion

85

On his direct appeal, petitioner, citing the Fourteenth Amendment of the United States Constitution, argued that his due process right to a fair trial was violated by the introduction of Captain Bolton's testimony.

The Appellate Division denied this claim on the merits, stating:

> The trial court properly exercised its discretion in permitting the People to introduce rebuttal evidence since it tended to disprove defendant's alibi (see, People v Harrington, 262 AD2d 220, lv denied 94 NY2d 823; see also, People v Marsh, 264 AD2d 647, lv denied 94 NY2d 825). While the re- buttal evidence concerned defendant's whereabouts several months prior to the crime, it was not collateral because defendant had made his various travels to Florida over an extended period of time integral parts of his alibi defense. Furthermore, the prejudicial effect of revealing to the jury that defendant had served 30 days in jail for an unspecified offense was minimal, particularly in light of the court's limiting instructions, and was outweighed by the probative value of the re- buttal evidence. In any event, were we to find any error, we would find it harmless in light of the overwhelming evidence of defendant's guilt.

People v. Rosario, supra, 288 A.D.2d at 142-43, 733 N.Y.S.2d 405 at 406.

Respondent first argues that petitioner did not prop- erly present his federal claim to the State appellate courts, and, thus, the claim is procedurally barred from habeas review (Resp. Op. at 58). Respondent contends that even though peti- tioner's brief to the Appellate Division cited to the Fourteenth Amendment of the United States Constitution and claimed that

petitioner was denied a fair trial, petitioner failed to explain how the evidence violated his federal Due Process rights (Resp. Op. at 60).  Respondent argues that under Second Circuit precedent, petitioner failed to put the state court on the required notice of his federal claim because to do so he "must demonstrate '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation'" (Resp. Op. at 59 quoting Daye v. Attorney General of State of New York, 696 F.2d 186, 194 (2d Cir. 1982)).

        Unlike petitioner here, the petitioner in Daye did not, in his briefs to the state courts, cite the provision of the United States Constitution on which he relied.  Daye v. Attorney Gen. of the State of New York, supra, 696 F.2d at 192.  Thus, the issue in Daye was how the exhaustion requirement could be met in the absence of an express reference in state court to a provision in the federal constitution.  In fact, the Second Circuit expressly stated that "[o]bviously if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state court."  Daye v. Attorney Gen. of the

87

State of New York, supra, 696 F.2d at 192.  In a more recent
opinion, also cited by respondent, the Second Circuit held that a
mere reference to a provision of the United States constitution
in a point heading of a brief sufficiently asserts a federal
claim even where the petitioner's argument only refers to state
law.  Davis v. Strack, 270 F.3d 111, 122 (2d Cir. 2001).  Peti-
tioner's brief to the Appellate Division contains the exact same
text that the Second Court found sufficient in Davis, namely,
that the evidence of petitioner's incarceration in Florida "DE-
PRIVED APPELLANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL.  U.S.
CONST., AMEND. XIV" (App. Div. Br. at i).  See Davis v. Strack,
270 F.3d at 122.

        Respondent also argues that petitioner failed to ex-
haust his federal claim in state court because his letter to the
New York State Court of Appeals did not identify any federal,
constitutional claims (Resp. Op. at 61).  This argument is
equally without merit.  Petitioner's letter to Chief Judge Kaye
uses language substantially identical to that of the petitioner
in Davis, and requested that the Court of Appeals "consider and
review all issues outlined in defendant-appellant's brief" (Jan.
2, 2002 Letter to Chief Judge Kaye, annexed as Ex. 3 to Resp.
Op.).  See also Davis v. Strack, supra, 270 F.3d at 122.  "[S]uch
a request is 'sufficiently specific' to present any federal
constitutional claim set forth in the Appellate Division brief to

the state Court of Appeals, regardless of whether the defendant reiterates the claim in any subsequent letter to the court." Davis v. Strack, supra, 270 F.3d at 122, citing Morgan v. Bennett, 204 F.3d 360, 369-72 (2d Cir. 2000).  Since petitioner's letter to Judge Kaye used the same language approved by the Second Circuit in Daye, petitioner fairly presented his constitutional claim to the Court of Appeals, and he may assert his claim in this court.

Finally, the Appellate Division's opinion clearly disposed of petitioner's evidentiary claim on the merits.  The Appellate Division's judgment discussed the substance of the claim and did not assert any procedural issues.  Accordingly, the Appellate Division's judgment is entitled to AEDPA's deferential standard of review, and petitioner cannot obtain habeas relief on this issue unless that decision was either contrary to, or involved an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

c.   Analysis

Generally, erroneous evidentiary rulings do not rise to the level of a constitutional violation -- the essential predicate for habeas relief.  Estelle v. McGuire, 502 U.S. 62,  67-68 (1991); Sims v. Stinson 101 F. Supp.2d 187, 194 (S.D.N.Y. 2000); Colon v. Johnson, 19 F. Supp.2d 112, 118 (S.D.N.Y. 1998); Roberts

v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y.), aff'd, 71 F.3d 406
(2d Cir. 1995); Alvarez v. Scully, 833 F. Supp. 1000, 1005
(S.D.N.Y. 1993).  A habeas court will review a trial court's
admission of evidence "[o]nly where evidence 'is so extremely
unfair that its admission violates fundamental concepts of jus-
tice.'"  Marsh v. Ricks, 02 Civ. 3449 (NRB), 2003 WL 145564, *3
(S.D.N.Y. Jan. 17, 2003) quoting Dowling v. United States, 493
U.S. 342, 352 (1990).  The erroneous admission of evidence will
rise to the level of constitutional error only where the peti-
tioner can show that it deprived him of a fundamentally fair
trial, and in this way, of due process of law.  See Taylor v.
Curry, 708 F.2d 886, 891 (1983); Alvarez v. Scully, supra, 833 F.
Supp. at 1005-06.  To amount to a denial of due process, the
evidence in question must have been "'sufficiently material to
provide the basis for conviction or to remove a reasonable doubt
that would have existed on the record without it.'"  Dunnigan v.
Keane, 137 F.3d 117, 125 (2d Cir. 1998), quoting Johnson v. Ross,
955 F.2d 178, 181 (2d Cir. 1992); Collins v. Scully, 755 F.2d 16,
18-19 (2d Cir. 1985); see also Mitchell v. Herbert, 97 Civ. 5128
(DC), 1998 WL 186766 at *5 (S.D.N.Y. April 20, 1998).  Even if
such constitutional error is established, habeas relief is war-
ranted only where the petitioner demonstrates that the error had
a "'substantial and injurious effect or influence in determining
the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637-38

(1993), quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946).

Counsel who seeks to challenge the credibility of a witness' testimony on a collateral matter generally may not introduce extrinsic evidence, such as calling a subsequent witness, to contradict answers given by the witness whose credibility is under attack.  See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 607.06[3][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2007).  Petitioner argues that the Trial Court erred by allowing the rebuttal testimony of Captain Bolton because his testimony "was collateral and used only to challenge Petitioner's credibility" (Pet. Mem. at 53).  However, it is not necessarily erroneous to permit a witness to testify for the purpose of impeaching another witness' testimony; "[t]he determinative question in deciding whether extrinsic evidence contradicting a witness' testimony is admissible is not whether the contradicting extrinsic evidence is material, but rather whether the assertions that the impeaching party seeks to contradict are themselves material or collateral." Rosario v. Kuhlman, 839 F.2d 918, 925-26 (2d Cir. 1988); see also People v. Schwartzman, 24 N.Y.2d 241, 245, 299 N.Y.S.2d 817, 821, 247 N.E.2d 642, 644 (1969) ("[W]hen a witness testifies concerning a fact material to the case, he may be contradicted either by cross-examination or by introduction of other evidence.").  Facts

that are relevant to a case for reasons other than mere credibility are material and not collateral. Rosario v. Kuhlman, supra, 839 F.2d at 926.

Petitioner testified on his direct examination that he made three separate trips to Florida in an attempt to make a life for himself there (Trial Tr. at 380-83). It was during these visits to Florida that petitioner came to know his alibi witnesses, John Torres and Jenine Seda. During his second visit, from February to mid-April of 1996, petitioner testified that he stayed at a friend's house near the home of John Torres and Jenine Seda, both of whom he saw frequently during that time (Trial Tr. at 383). Petitioner's presence in John and Seda's neighborhood and his frequent association with them for the entirety of his second trip to Florida would tend to show that John and Seda were more capable then they might otherwise be of vouching for Petitioner's whereabouts during his third trip in June. Thus, petitioner made his second sojourn in Florida a relevant material piece of his alibi defense. Moreover, when the prosecution cross-examined petitioner about the specifics of where he stayed in Florida from March to April, defense counsel made no objections to the relevancy of those questions. Since petitioner's whereabouts from March through April of 1996 were material and relevant to his alibi defense, the Trial Court did

not err by permitting the introduction of extrinsic evidence to contradict petitioner's testimony on that matter.

      Not only was it permissible to introduce extrinsic evidence impeaching petitioner's testimony about his living arrangements because it was relevant testimony, but the evidence was also admissible because petitioner had opened the door for its introduction.  Petitioner testified on direct examination that he "stayed [at Ms. Beane's house] until April," and the reason why he remained in Florida until the middle of April, even though he had not found employment, was because he was "having a good time" (Trial Tr. at 384).  "[W]here a defendant, in his direct testimony, falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied as to the fact."  United States v. Beno, 324 F.2d 582, 588 (2d Cir. 1963) citing Walder v. United States, 347 U.S. 62, 74 (1954); accord United States. v. Benedetto, 571 F.2d 1246, 1250 (2d Cir. 1978).  This is so regardless of whether the issue is collateral, as "a defendant should not be allowed to profit by a gratuitously offered misstatement."  United States v. Beno, supra, 324 F.2d at 588.  Because petitioner testified falsely on his direct examination about where and why he stayed in Florida during his second trip, it was not improper for the Trial Judge to permit the

prosecution to offer Captain Bolton's testimony regarding peti-
tioner's incarceration.[14]

   Petitioner also argues that there was no need for the
prosecution's rebuttal evidence because Rosario was not dishonest
in his testimony -- "no one could have reasonable expected peti-
tioner to testify that he 'stayed' in a county jail when asked
where he lived during his second trip to Florida.  It is entirely
consistent to 'live' in a residence while being 'held' in a
correctional facility" (Pet. Mem. at 54).  Even if I were to
accept this logic, the argument still overlooks the nature of
petitioner's testimony during his cross-examination:

> Q: How long did you stay with Miss Beane?
>
> A: I stayed at her house until I came back to
> New York City.
>
> Q: And you were in her house for the entire
> time?
>
> A: Yes.
>
> Q: And that was from March or February?
>
> A: From February.
>
> Q: Until March?

---

[14]Petitioner cites People v. Goggins, 64 A.D.2d 717, 717-18,
407 N.Y.S.2d 531, 532 (2d Dep't 1978), for the proposition that
that a prosecution's introduction of extrinsic evidence of a
collateral issue to attack a defendant's credibility deprives the
defendant of a fair trial (Pet. Mem. at 52).  That case, however,
involved extrinsic evidence that challenged testimony the
defendant gave only on cross-examination.  People v. Goggins,
supra, 64 A.D.2d at 717, 407 N.Y.S.2d at 531.  The case at bar is
distinguishable in that petitioner testified falsely during both
his direct and his cross-examinations.

A:   It's passed March.

Q:   Into April in fact, isn't that correct?

A:   Yes.

Q:   And during that time from February when you
     arrived there until you left for New York in
     April, you are telling this jury you were
     living with Miss Beane?

A:   I was staying with her.  That's correct.

Q:   And you would stay there on a daily basis,
     correct?

A:   Yes.

.  .  .

Q:   You weren't staying with Johnny Torres in
     April?

A:   No, I was not.  I was staying with Shannon.
     I came back on the 15th.  I got here a Monday
     [sic].  No, I got here on Sunday.  It was the
     14th.  I started working on the Monday.
     That's how come I remember that date.

Q:   But, for the first two weeks in April --

A:   Yes

Q:   When you were --

A:   No.  I was staying with Shannon and, yes, I
     did see Johnny.

Q:   So, Mr. Rosario, for those first two weeks of
     April that you were in Florida --

A:   yeah.

Q:   – you were with Shannon and not with Johnny
     Torres, is that correct?

A:   No, I wasn't, but I did see Johnny in
     Florida.

> Q:   In March of 1996, you were in Florida, cor-
>      rect?
>
> A:   Yes.
>
> Q:   And again, you were with Shannon and Not
>      Johnny Torres?
>
> A:   Correct

(Trial Tr. 394-98).  Petitioner did not just testify that he
"stayed" and "lived" with Ms. Beane while he was incarcerated.
Petitioner agreed that from February until he left Florida in
mid-April, he was "in [Ms. Beane's] house for the entire time,"
and that he would "stay [at Ms. Beane's house] on a daily basis"
(Trial Tr. at 394-397).  I cannot agree that petitioner's testi-
mony regarding his whereabouts from March until mid-April of 1996
was truthful or even substantially truthful; the simple truth is
that even though petitioner stayed with Ms. Beane during his
second trip to Florida, the last month of that trip was spent not
at her home, but in a correctional facility.  Thus, petitioner's
testimony during cross, coupled with his misleading testimony on
direct (discussed on page 83, above) gave cause for the prosecu-
tion's rebuttal evidence.

        Petitioner also asserts that the rebuttal evidence
rendered his trial unfair and violated his Due Process rights
because as a result of that evidence "the jury inevitably per-
ceived him as a bad person with the propensity to commit crimes,
such as the murder at issue" (Pet. Mem. at 53).  To protect

petitioner from such an adverse inference, the Trial Judge issued a limiting instruction to the jurors that they were not to consider evidence of Rosario's incarceration as evidence of a propensity to commit crimes (Trial Tr. at 565).   Jurors are presumed to abide by a trial judge's instructions to limit consideration of evidence.   Zafiro v. United States, 506 U.S. 534, 540-41 (1993) ("[J]uries are presumed to follow their instructions" quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)); accord United States v. Stewart, 433 F.3d 273, 307 (2d Cir. 2006) (noting it is a "well-settled proposition" that jurors are presumed to follow limiting instructions).   Petitioner argues that a limiting instruction such as this, "does little -- if anything -- to mitigate the severe and wholly unnecessary prejudice that subsequently infected the trial" (Pet. Mem. at 54).   As petitioner points out, in some situations a limiting instruction to a jury is unlikely to prevent the average juror from inferring that a prior conviction shows a defendant has the propensity to commit the crime with which he is charged (Pet. Mem. at 54 citing United States v. Puco, 453 F.2d 539, 542 (2d Cir. 1971)).   Such an inference, despite a limiting instruction, is likely to arise where the government seeks to impeach a criminal defendant with evidence of a conviction for a crime similar to the crime with which he or she is currently being tried.   See United States v. Puco, supra, 453 F.2d at 542; United States v. Ortiz, 553 F.2d

782, 784 (2d Cir. 1977).  The prejudicial effect of evidence of
prior crimes is also more likely to substantially outweigh its
probative value when the prior crime "negates credibility only
slightly." United States v. Puco, supra, 453 F.2d at 542 quoting
United States v. Palumbo, 401 F.2d 270, 273 (2d Cir. 1968); see
also Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997).

 Evidence of petitioner's Florida incarceration at his
murder trial does not, however, rise to the level of being sub-
stantially prejudicial under either theory.  A month-long incar-
ceration, regardless of what a juror may infer regarding its
cause, is unlikely to be perceived by a juror as suggesting that
a defendant committed murder, attempted murder or another similar
violent offense.  Evidence of petitioner's incarceration was also
probative of petitioner's credibility, since it served to impeach
his testimony that he was living with a friend during the time he
was in jail.  Thus, the prosecution's rebuttal evidence did not
result in unfair prejudice that substantially outweighed the
evidence's probative value, and it did not render petitioner's
trial fundamentally unfair in violation of his Due Process
rights.

 Lastly, it is of no moment that the jury was not in-
formed that petitioner had initially told the police about his
incarceration in Florida.  The fact that petitioner reported his
incarceration to the police is irrelevant to whether petitioner

mislead the jury at trial.  Petitioner fails to explain how
informing the jury of this information could have rehabilitated
him.

     For all the foregoing reasons, I conclude that the
Appellate Division's decision that the Trial Judge properly acted
within his discretion when he allowed the prosecution's rebuttal
evidence was not contrary to, or an unreasonable application of,
clearly established federal law.  Thus, this claim should be
denied.

     4.   <u>Actual Innocence Claim</u>

     Finally petitioner claims that his habeas petition
should be granted because he is actually innocent of the murder
for which he was convicted.  This claim is denied on the merits.

     The doctrine of actual innocence in habeas claims
developed to prevent a "miscarriage of justice" where procedural
rules might otherwise prevent a federal court from considering a
claim by a petitioner who is factually innocent of the crime for
which he or she was convicted.  <u>Schlup v. Delo</u>, 513 U.S. 298
(1995), <u>citing</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 495 (1986);
<u>Kuhlmann v. Wilson</u>, 477 U.S. 436 (1986); <u>Smith v. Murray</u>, 477
U.S. 527 (1986).  The doctrine mitigates the harshness of proce-
dural requirements intended to protect the interests of finality
and comity that are threatened by successive or untimely federal

review of state convictions.  Doe v. Menefee, 391 F.3d 147, 160 (2d Cir. 2004).

Petitioner's claim of actual innocence was not raised in state court and is asserted for the first time in his habeas petition.  However any procedural default that might otherwise exist would not bar a meritorious claim of actual innocence.[15] Doe v. Menefee, supra, 391 F.3d at 161, citing Schlup v. Delo, supra, 513 U.S. at 315-17.

To prevail on a claim of actual innocence, a petitioner must present new reliable evidence in light of which it is more likely than not that no reasonable juror would have convicted petitioner.  Schlup v. Delo, supra, 513 U.S. at 327; accord Murden v. Artuz, 497 F.3d 178, 194 (2d Cir. 2007).  See also House v. Bell, supra, 126 S.Ct. at 2078 (upholding the Schlup standard to defaulted habeas claims despite the passage of AEDPA-).  To meet the Schlup standard, a petitioner must "support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence -- that was not presented at trial."  Schlup v. Delo, supra, 513 U.S. at 324; accord Guity v. Ercole, 07 Civ. 728 (RPP), 2007 WL 3284694 at *8

_____

[15]This is true even after the passage of AEDPA, which codifies aspects of the actual innocence doctrine in provisions not relevant to this case.  See Doe v. Menefee, supra, 391 F.3d at 161 citing 28 U.S.C. §§ 2244(b); 2254(e)(2).

(S.D.N.Y. Nov. 6, 2007).  Thus, a reviewing court that determines new evidence is reliable must analyze the claim of innocence in light of the entire record, including evidence that may have been inadmissible at trial.  Doe v. Menefee, supra, 391 F.3d at 162.  After, making its own credibility assessments, if the court then concludes it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt, the actual innocence standard is satisfied and the court may review the constitutional challenge.  Doe v. Menefee, supra, 391 F.3d at 163; accord Sacco v. Greene, 04 Civ. 2391 (CLB), 2007 WL 432966 at *7 (S.D.N.Y. Jan. 30, 2007).

In support of petitioner's actual innocence claim, petitioner cites the total of nine witnesses (Jenine Seda, John Torres, and the seven witnesses presented at his post-conviction hearing) who testified regarding petitioner's presence in Florida on or around the date of the murder.  Petitioner also relies on the documentary evidence that petitioner was stopped by police in Florida on May 30 and traveled by bus from Florida to New York on June 30 (Pet. Mem. at 57).  Petitioner argues that in light of the totality of the evidence, no reasonable juror would find that petitioner returned to New York from Florida after May 30, failed to contact his fiancee, Minerva Godoy and their children, engaged in a random argument with the victim after which he shot the victim in the head, and traveled back to Florida only to return

days later and turn himself in to the police.  In addition, in order to find petitioner guilty, a juror would have to find that John Torres, Jenine Seda, Fernando Torres and Chenoa Ruiz all lied under oath when testifying that they each saw petitioner in Florida on June 19 (Pet. Mem. at 57-58).

As I stated in my analysis of petitioner's ineffective assistance of counsel claim, the totality of evidence presented at petitioner's trial and post-conviction hearing raised a reasonable probability that the jury could have found petitioner not guilty of murder had Fernando and Chenoa testified.  However, in assessing all of the evidence presented at petitioner's trial and post-conviction hearing, I cannot conclude petitioner's evidence satisfies the substantially higher standard necessary to sustain a claim of actual innocence.  Murden v. Artuz, supra, 497 F.3d at 194 (Actual innocence "requires a stronger showing than the showing of prejudice necessary to prevail on an ineffective assistance claim." (internal quotation marks omitted)).  Petitioner's evidence does not show that it is more likely than not that no reasonable juror could have found petitioner guilty for the June 19 murder.

First, in light of the evidence, it would not be unreasonable for a juror to find that petitioner was in fact in Florida in June of 1996, then returned to New York in the middle of the month, only to flee after the commission of Collazo's

murder.  Petitioner freely admitted that he traveled back and
forth to Florida on a number of occasions with only brief stays
in New York between those trips (Trial Tr. at 377-80, 386-87,
399).  It is likewise not implausible that petitioner would
immediately flee New York after committing a murder and later
turn himself in to the police, who were already looking for him,
in the hope of prevailing on an alibi defense.  At trial the
prosecution's eyewitnesses, Sanchez and Davis, testified that
they were very confident when recognizing petitioner as the
shooter (Trial Tr. at 165, 66), and their testimony has not been
impeached.  John Torres, Jenine Seda and Chenoa Ruiz were all
part of a group of friends to which petitioner belonged, and
Fernando Torres is the father of two of those friends.  Thus
these alibi witnesses were all still subject to impeachment based
on their relationship to petitioner.  In light of all the evi-
dence. I cannot conclude that no reasonable juror would credit
the prosecution's witnesses over the greater number of defense
witnesses.  See 1 Hon. Leonard B. Sand, John S. Siffert, Walter
P. Loughlin & Steven A. Reiss, Modern Federal Jury Instructions
Inst. 4-3 (2005) (A jury is free to credit the side offering a
smaller number of witnesses.).

        Furthermore, in making an actual innocence determina-
tion the habeas court must determine "whether the new evidence on
which the actual innocence claim is based is reliable."  Doe v.

Menefee, supra, 391 F.3d at 165.  Chenoa's testimony at peti-
tioner's 440 hearing appears to conflict with John Torres' testi-
mony at petitioner's trial.  Chenoa testified that she recalled
seeing petitioner and John at Seda's house on June 19 because she
had taken Seda to a doctor's appointment at approximately 11:30
a.m. and did not return until later in the afternoon (Hrg. Tr. at
548, 550).  John testified that Seda worked on June 19 (Trial Tr.
at 349).  In addition, while the prosecution's witnesses testi-
fied to events that occurred over two years prior, petitioner's
post-conviction hearing witnesses testified to events that oc-
curred about six years prior.  Even where petitioner's witnesses
may have absolutely no intention of misleading the court, six-
year old memories are inherently not as reliable as two and a
half-year old ones.

Thus, petitioner has failed to establish that "in light
of all the evidence, it is more likely than not that no reason-
able juror would have convicted him," and his claim of actual
innocence should be denied.  See Bousley v. United States, 523
U.S. 614, 623 (1998).

IV.  Conclusion

Accordingly, for all the foregoing reasons, I re-
spectfully recommend that petitioner's petition for a writ of
habeas corpus be granted with respect to his claim that the

104

prosecutor's use of peremptory challenges established a <u>prima</u> <u>facie</u> case of racial discrimination unless within ninety (90) days of the final resolution of this proceeding, the New York State courts conduct a reconstruction hearing and conclude that race did not play a role in the prosecution's exercise of its peremptory challenges.  I recommend that the habeas petition be denied with respect to petitioner's claims that (1) he received ineffective assistance of counsel, (2) the Trial Court erred in allowing the prosecutor to introduce extrinsic evidence of his Florida incarceration, and (3) the evidence demonstrates he is actually innocent of the crime.

Since petitioner has made a substantial showing of the denial of a constitutional right with respect to his claim of ineffective-assistance, I also recommend that a certificate of appealability be issued for that claim but that no certificate of appealability be issued for his evidentiary and actual innocence claims.  28 U.S.C. § 2253.  To warrant the issuance of a certifi- cate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Middleton</u> <u>v. Attorneys Gen.</u>, 396 F.3d 207, 209 (2d Cir. 2005) (<u>per</u> <u>curiam</u>) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Love v. McCray</u>, 413 F.3d 192, 195 (2d Cir. 2005) (<u>per</u> <u>curiam</u>).  For the reasons set

forth above, I conclude that there could be a difference of opinion among reasonable jurists that petitioner's federal rights were violated with respect to his ineffective-assistance claim, but not with respect to his evidentiary or actual innocence claims.

## V.  Objections

_____        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections.  See also Fed.R.Civ.P. 6(a) and 6(e).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States District Judge, 500 Pearl Street, Room 2260, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Castel.  FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

106

(1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:    New York, New York
          December 28, 2007

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:


Christopher Blira-Koessler, Esq.
Assistance District Attorney
Office of the Bronx County District Attorney's Office
198 East 161st Street
Bronx, NY 10451


Carl H. Loewenson, Jr.
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Jin Hee Lee
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Jodi K. Miller
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, NY 10104