UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RICHARD ROSARIO,

                   Petitioner,                   05 Civ. 8072 (PKC)

        -against-

                                         MEMORANDUM
                                       <u>AND ORDER</u>

SUPERINTENDANT ROBERT ERCOLE,
                        Respondent.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          Following a jury trial in the New York Supreme Court, Bronx County,

petitioner Richard Rosario was convicted of one count of murder in the second degree

under New York Penal Law Section 125.25. The trial court sentenced Rosario to a term

of imprisonment of 25 years to life, pursuant to which he currently is incarcerated. He

directly appealed his judgment and conviction to the New York Supreme Court Appellate

Division, First Department, *People v. Rosario*, 288 A.D.2d 142 (1st Dep't 2001), and on

March 26, 2002, was denied leave to review by the New York Court of Appeals. *People

v. Rosario*, 97 N.Y.2d 760 (2002) (table). On September 16, 2005, Rosario filed this

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

          The habeas petition asserts four grounds for relief. First, he asserts that he

was denied the effective assistance of counsel pursuant to *Strickland v. Washington*, 466

U.S. 668 (1984). Second, he asserts that the trial court incorrectly ruled that he failed to

establish a *prima facie* case of discrimination pursuant to *Batson v. Kentucky*, 476 U.S.

79 (1986). Third, he asserts that the trial court deprived him of a due process right to a

fair trial by improperly admitting extrinsic evidence of prior incarceration. Fourth, he asserts that he is actually innocent of the crime for which he was convicted.

I referred the petition to Magistrate Judge Henry B. Pitman on December 29, 2005. In a thorough, 107-page Report and Recommendation (the "R & R") dated December 28, 2007, Magistrate Judge Pitman recommended that Rosario's petition be conditionally granted as to his *Batson* claim and denied in all other respects. Both the petitioner and respondent have filed objections to the R & R.

I have reviewed the R & R *de novo*. R. 72(b), Fed. R. Civ. P.; 28 U.S.C. § 636(b)(1). For the reasons explained below, I modify the R & R to the extent that it conditionally recommends granting the petitioner's *Batson* claim. I adopt the R & R in all other respects. The petition is denied.

Background

On June 19, 1996, George Collazo was fatally shot in the head on Turnbull Avenue in Bronx County, New York. (Trial Tr. at 19.) At least three eyewitnesses observed the incident, (Trial Tr. at 54-56, 133-66, 286-94.) though only two of them testified that Rosario was the shooter. One witness, Michael Sanchez, was a friend of the victim and present with him at the time of the shooting. (Trial Tr. at 137-65, 286-94.) He testified that an argument arose between Rosario and the victim after the victim uttered a racial epithet, and stated that he had a clear and unobstructed view of Rosario's face during the verbal quarrel. (Trial Tr. at 139-50.) According to Sanchez, Rosario approached from behind shortly thereafter, and shot the victim with a revolver. (Trial Tr. at 152-55.) Three weeks after the shooting, a police lineup was organized, and Sanchez identified Rosario as the shooter. (Trial Tr. at 164-65.) At trial Sanchez again

identified Rosario as the shooter, and stated that he had no doubt, either at the lineup or at trial, that his identification of Rosario was correct. (Trial Tr. at 165.) A second witness, Richard Davis, identified Rosario as the shooter after reviewing photographs provided by police; he testified at trial that he had an unobstructed view of the shooting. (Trial Tr. at 53-66.) A third witness, Jose Diaz, testified that he heard the fatal shot and stated that he might be able to recognize the persons involved in the dispute preceding the shooting, but he did not identify Rosario in the courtroom. (Trial Tr. at 292-96.)

Two alibi witnesses – Jenine Seda and John Torres – testified at trial that Rosario was with them in Florida on the day of the shooting. (Trial Tr. at 305-09.) Seda testified that she specifically recalled Rosario's presence in her home, because the date of the shooting was one day before she gave birth to a son, and she further testified that Rosario was present in her home when she returned from the hospital. (Trial Tr. at 328, 334-35.) John Torres, Rosario's friend and the father of Seda's baby, testified at trial that on the day of the shooting, Rosario had spent the day with him purchasing auto parts for a broken-down car. (Trial Tr. at 347.) Rosario also offered the testimony of a New York terminal manager for Greyhound Busline, who authenticated and explained a "readout of a transaction" dated June 30, 1996, indicating that Rosario had purchased bus tickets from Orlando, Florida to New York City. (Trial Tr. at 366-69.) The terminal manager also testified that passengers generally are not required to submit identification when they pay and board, and are not required to use the ticket on its date of purchase. (Trial Tr. at 371-72.)

Rosario testified in his own defense, and asserted that he was present in Florida from late May through June 30, 1996, during which he hoped to find work and

ultimately relocate. (Trial Tr. 399-400.) Rosario further testified that his New York fiancée Minerva Godoy wired money to him in Florida via Western Union at least three times, and that the transfers were addressed to John Torres because Rosario himself lacked valid, government-issued identification. (Trial Tr. at 422-24.) He stated that he resided with John Torres and Jenine Seda until after the birth of their child on June 20, 1996 (Trial Tr. at 409-10); that he and John Torres spent a day looking for auto parts together, even though he could not recall the precise date (Trial Tr. at 419.); and that he returned to New York from Florida on June 30, 1996, upon hearing from his sister that detectives wished to speak to him in connection with the Collazo shooting. (Trial Tr. at 388-89.)

In rebuttal, the prosecution offered the testimony of Captain Bruce Bolton, records custodian of the Department of Corrections in Volusia County, Florida. Bolton testified that the Department's records showed that Rosario was in Department custody from March 13, 1996, through April 12, 1996. (Trial Tr. at 451.) Prior to this testimony, Rosario's counsel objected that the rebuttal evidence would be unduly prejudicial, and that Rosario was never directly questioned about his incarceration, such that Bolton's testimony constituted extrinsic evidence on a collateral matter. (Trial Tr. a 435-38.) The objection was overruled. (Trial Tr. at 438-39.)

The jury found Rosario guilty of murder in the second degree. (Trial Tr. at 595-98.)

Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 100 Stat. 1218 ("AEDPA"), federal

courts must accord deference to the state court's determination of a habeas petitioner's claims. A federal court should not grant habeas relief to a person in custody pursuant to a state court judgment unless the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[T]he meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

I.      Pursuant to the Standard of Review Set Forth by AEDPA, the R & R is <u>Adopted, and Petitioner's Ineffective Assistance Claim is Dismissed</u>

In support of his claim that he received ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution, Rosario argues that his trial counsel failed to undertake a sufficient investigation of his alibi defense, and neglected to seek out relevant and readily available witnesses and documentary evidence that established his presence in Florida on the date of Collazo's shooting. He contends that counsel's actions were based in error and neglect, rather than conscious strategic decisions.

Rosario's ineffective assistance claim is directed toward two of the four attorneys who represented him between his arrest and jury trial. Joyce Hartsfield represented Rosario from mid-July 1996 through mid-February 1998. (Hearing Tr. at 13-14, 117.) Steven J. Kaiser then represented Rosario through the conclusion of trial. (Hearing Tr. at 117.) The R & R recommended that I dismiss Rosario's ineffective

assistance claim based on the standard of review set forth in Section 2254(d)(1). For the reasons explained below, I adopt the R & R's recommendation.

    A.  <u>At Rosario's Post-Conviction 440.10 Hearing, Several Alibi Witnesses Testified that He was Present in Florida During June 1996</u>

The R & R thoroughly and carefully sets forth the events and testimony relevant to the ineffective assistance claim. I briefly recount them here.

Following Rosario's unsuccessful direct appeal of his judgment and conviction, he filed a motion to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law, arguing that he had been denied effective assistance of counsel in regard to his alibi defense. An evidentiary hearing was conducted before the Honorable Edward M. Davidowitz, Justice of the Supreme Court, Bronx County. In total, the 440.10 hearing included testimony from ten witnesses, including seven alibi witnesses, attorneys Kaiser and Hartsfield, and the private investigator that Hartsfield retained. Rosario was represented by counsel and presented his ineffective assistance case at length. (Miller Dec. Ex. 61.)

The R & R concluded that Rosario exhausted his ineffective assistance claim in state court (R & R at 23-24), a conclusion that I adopt.

At the section 440.10 hearing, Hartsfield testified that she sought no documentary records to support Rosario's alibi defense, including, among other things, money transfer records from Western Union that subsequently were destroyed pursuant to Western Union's routine expunging of business records. (Hearing Tr. at 28, 32; Miller Ex. 53.) Hartsfield did, however, retain an investigator named Jessie Franklin, for the purpose of locating and interviewing prospective alibi witnesses. (Hearing Tr. at 42-43.) Franklin spoke to Fernando Torres (father of trial alibi witness John Torres) and Robert

Torres (John's brother). (Activity Log of Jessie Franklin, attached at Miller Dec. Ex. 17.) On April 16, 1997, Hartsfield successfully applied to the court for funds to further investigate the alibi defense, (Miller Dec. Ex. 29) and yet for reasons that are not entirely clear, pursued no subsequent investigation. She implied that logistical concerns and unawareness of funding availability both may have influenced her actions. (Hearing Tr. at 50.) Hartsfield stated that there was no conscious strategic decision not to press forward with investigating Rosario's alibi defense:

> Q. Miss Hartsfield, while you were representing Mr. Rosario, did you make a conscious strategic decision not to contact any particular witness?
>
> A. No.
>
> Q. And while you were representing Mr. Rosario, did you make a conscious strategic decision not to pursue any particular evidentiary leads?
>
> A. No.

(Hearing Tr. at 73.) In objecting to the R & R, the respondent also notes the following testimony from Hartsfield:

> Q. And you didn't have a strategic reason not to send [Jessie Franklin] during that year [to Florida], did you?
>
> A. Not that I can recall, no, no.

(Hearing Tr. at 52.) Hartsfield did, however, testify that a successful alibi defense relied on witness credibility, and that a non-credible witness could jeopardize the defense. (Hearing Tr. at 95.) When asked whether John Torres and Jenine Seda were the best possible witnesses to provide alibi testimony, Hartsfield stated that she was "not in a position to make that evaluation." (Hearing Tr. at 95.)

Hartsfield's successor, Kaiser, stated via affirmation that Hartsfield indicated to him that the court had not authorized funds for a Florida investigation, (Miller Dec. Ex. 50)[1] but then submitted a second affirmation retracting his assertion that Hartsfield told him about a lack of funds, noting that his "recollection is presently unclear" about the source of his misimpression concerning the availability of investigation funds. (Miller Dec. Ex. 52.) He affirmed that he nevertheless attempted to locate and contact alibi witnesses in Florida. (Miller Dec. Ex. 52.) As to the decision not to present additional alibi witnesses, he testified at the 440.10 hearing that he was under an impression that John Torres's parents, Fernando and Margarita, seemed unwilling to travel to New York on grounds of expense, and generally seemed reluctant to serve as witnesses. (Hearing Tr. at 192-95.) He further testified that additional witnesses merely may have duplicated the testimony of John Torres and Jenine Seda in a less-cooperative manner. (Hearing Tr. at 196, 276-78.) He stated that John Torres and Jenine Seda seemed like the best possible witnesses because they could establish the date of Rosario's presence, and had no prior convictions that would leave them vulnerable to impeachment. (Hearing Tr. at 196, 221, 225.) He noted at trial that they "weren't impeached in any way as being bad characters." (Hearing Tr. at 196.) He did, however, state that he would have preferred to call additional alibi witnesses, including those who did not live with Rosario. (Hearing Tr. at 196-98.) Kaiser testified at the hearing that he was under the impression that funds for an investigation had been denied, so he made no effort to pursue one. (Hearing Tr. at 128-29, 133, 210-11.)

---

[1] Hartsfield stated via affidavit that she did not recall making this representation to Kaiser. (Miller Dec. Ex. 51.)

Jessie Franklin, the investigator that Hartsfield retained to pursue Rosario's alibi defense, also testified at the hearing. Her notes reflected that she held an hour-long meeting with Rosario, who provided contact information for John Torres, Robert Torres, Chenoa Ruiz, Ricardo Ruiz, Nerida Colon and Denise Hernandez. (Miller Dec. Ex. 19.) She stated that prior to drafting an affidavit supporting a grant of additional investigation funds, she had contacted only two potential witnesses, Fernando and Robert Torres. (Hearing Tr. at 384-85, 403-04.) Both men indicated to her that they saw Rosario in Florida in late June 1996. (Hearing Tr. 391-92, 437-38; Notes of Jessie Franklin, attached at Miller Dec. Ex. 21.) Franklin did not subsequently contact Fernando or Robert Torres, and assumed that the request for investigation funds had been denied in light of lack of communication from Hartsfield. (Hearing Tr. at 403, 407.) She later resumed the investigation, contacted Jenine Seda and John Torres, and was told by John Torres that he could provide names of other alibi witnesses. (Hearing Tr. at 411-14.) Franklin attempted to contact others named by Rosario, but was unsuccessful. (Hearing Tr. at 415-17.) She testified that Kaiser never contacted her as to the investigation. (Hearing Tr. at 421-22.)

Several alibi witnesses provided testimony stating that Rosario was present in Florida in or around late June 1996. Fernando Torres testified that on the day of Collazo's murder, he accompanied Rosario and John Torres on trips to buy auto parts, and that he did not know until several years after the fact the crime for which Rosario was convicted occurred on June 19, 2006. (Hearing Tr. at 318-19, 364, 371-72, 374-75.) He then submitted a post-hearing statement stating that he saw Rosario in John Torres's apartment on June 19. (Miller Dec. Ex. 56.) Chenoa Ruiz, a next-door neighbor to John

Torres and Jenine Seda, testified that she observed Rosario on both June 18 and June 19, and recalled frequently feeling irritated with Rosario because he so often was "hanging out" with John Torres, who she believed should have been tending to Seda's pregnancy. (Hearing Tr. 497, 503, 527.) Rosario also was memorable to her, she added, because he often kept her boyfriend out late at night, which caused her problems. (Hearing Tr. at 527.) She stated that she specifically observed Rosario at the home of John Torres and Jenine Seda on June 19, when she picked up Seda for a doctor's appointment. (Hearing Tr. at 548, 550.) She stated that she was not contacted by any attorney for Rosario until after his conviction, and that she would have been willing to testify at his trial. (Hearing Tr. at 509-10.) Michael Serrano testified that he recalled Rosario being present when John Torres returned from the hospital after Seda gave birth on June 20 – one day after Collazo's shooting. (Hearing Tr. 719-20.) Various other witnesses testified that they observed Rosario in Florida in June 1996, and the R & R summarizes their testimony in detail. (R & R at 33-36, summarizing testimony of Ricardo Ruiz Minerva Godoy, Denise Hernandez and Lisette Rivera.)

  B. <u>Following the 440.10 Hearing, Rosario's Motion for Relief Based on Ineffective Assistance was Denied in the New York Supreme Court, Bronx County</u>

Justice Davidowitz issued a 22-page opinion denying post-conviction relief. (Miller Dec. Ex. 62.) He summarized the testimony provided by witnesses at the 440.10 hearing. (Miller Dec. Ex. 62 at 7-15.) Justice Davidowitz ruled that Rosario received effective representation pursuant to the constitutions of the United States and the State of New York, and evaluated effectiveness pursuant to New York's "meaningful representation" standard set forth in *People v. Benevento*, 91 N.Y.2d 708 (1998), and

*People v. Baldi*, 54 N.Y.2d 137 (1981). His opinion noted that it was "relevant, but not dispositive" whether, but-for counsel's errors, Rosario would have been acquitted. (Miller Dec. Ex. 62 at 15.) The opinion noted that "meaningful representation" is assessed in a broad context and considers the attorney's performance during the entire course of representation. (Miller Dec. Ex. 62 at 16-17.) Justice Davidowitz held that any error concerning the availability of investigation funds was due to "a misunderstanding or a mistake" and was not deliberate, (Miller Dec. Ex. 62 at 18) and also emphasized that two alibi witnesses testified at Rosario's criminal trial. (Miller Dec. Ex. 62 at 18-19.) He considered John Torres and Jenine Seda the most credible among the possible alibi witnesses, and concluded that the other prospective witnesses, "studied closely, were, for the most part, questionable and certainly not as persuasive as the two witnesses who did testify, and were rejected by the jury." (Miller Dec. Ex. 62 at 21-22.) On September 8, 2005, the Appellate Division denied leave to appeal Justice Davidowitz's decision. (Miller Dec. Ex. 63.)

     C.    <u>AEDPA's Deferential Standard of Review Requires Dismissal of Rosario's Ineffective Assistance Claim</u>

An ineffective assistance claim is determined under the well-known criteria of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* established a two-prong analysis for considering such a claim. The first considers whether counsel's performance was objectively unreasonable. Any errors by counsel must be "so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, the petitioner must establish prejudice, as *Strickland* requires "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Both error and prejudice must be established. *Id.*

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Scrutiny of counsel's performance "must be highly deferential" and avoid hindsight. *Strickland*, 566 U.S. at 689. The petitioner bears the burden of proof to establish a constitutional violation in a habeas corpus proceeding. *Zappulla v. New York*, 391 F.3d 462, 489 n.19 (2d Cir. 2004).

"An ineffective assistance claim asserted in a habeas petition is analyzed under the 'unreasonable application' clause of AEDPA because it is 'past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States . . .'" *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) (quoting *Williams*, 529 U.S. at 391, *cert. denied*, 127 S.Ct. 1383 (2007)). The petitioner must do more than "convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cox v. Donnelly*, 387 F.3d 193, 197 (2d Cir. 2004) (alteration in original) (quoting *Bell v. Cone*, 535 U.S. 685, 698-99 (2002)). "Unreasonableness is determined by an objective standard," *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005), *cert. denied*, 547 U.S. 1191 (2006), and therefore "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must reflect "'[s]ome increment of

incorrectness beyond error,'" *Gersten*, 426 F.3d at 607 (alteration in original) (quoting *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005)), although the increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Yung v. Walker*, 341 F.3d 104, 110 (2d Cir. 2003) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

   In a careful and detailed analysis, the R & R independently concluded that both prongs of the *Strickland* test had been violated, (R & R at 42-56) before recommending dismissal of petitioner's ineffectiveness claim pursuant to AEDPA and the law of the Second Circuit. (R & R at 56-64.) I adopt Magistrate Judge Pittman's recommendation that AEDPA requires dismissal of petitioner's *Strickland* claim.

   As Rosario points out, the law of the State of New York does not analyze ineffectiveness claims pursuant to the *Strickland* framework. Instead, New York law looks to whether a defendant received "meaningful representation" during the process as a whole. *Benevento*, 91 N.Y.2d at 713-14. As noted by the R & R, Justice Davidowitz evaluated counsel's performance pursuant to "a number of issues routinely considered by New York courts in analyzing whether or not counsels' errors amounted to ineffective assistance, such as did counsel perform competently in other respects and were counsels' errors so seriously prejudicial as to compromise a defendant's right to a fair trial." (R & R at 57 (collecting cases).) The R & R summarized Justice Davidowitz's conclusions, noting that Rosario's counsel filed all appropriate motions, competently examined witnesses and presented competent opening and closing statements, and offered a credible alibi defense. (R & R at 57.) The R & R also noted Justice Davidowitz's

conclusion that the alibi witnesses not called at Rosario's criminal trial were less persuasive than John Torres and Jenine Seda. (R & R at 57-58.)

First, I address whether the state court decision was "contrary to" *Strickland*. A state court decision is "contrary to" federal law if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed to" relevant Supreme Court precedent. *Williams*, 529 U.S. at 405. The Second Circuit has held that New York's standard of "meaningful representation" is not "contrary to" *Strickland*'s interpretation of the Sixth Amendment. *See, e.g., Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d Cir. 2003); *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001). As noted, the Second Circuit also has indicated that a habeas petition raising *Strickland* is subject to "unreasonable application" analysis, and not the "contrary to" criteria set forth in AEDPA. *Lynn*, 443 F.3d at 247.

The R & R notes language from *Henry*, which appeared to question whether New York's approach to ineffectiveness necessarily satisfies *Strickland*'s prejudice prong. A relevant portion of *Henry* observes:

> [I]n light of the *Strickland* principle that an ineffective assistance claim is established if the court concludes that there is a reasonable probability that but for counsel's professional deficient performance the outcome of the proceeding would have been different, we find it difficult to view so much of the New York rule as holds that "*whether defendant would have been acquitted of the charges but for counsel's errors is ... not dispositive,*" as not "contrary to" the prejudice standard established by *Strickland*.

*Henry*, 409 F.3d at 71 (emphasis and ellipses in original; citations omitted). *Henry* also noted that the New York standard considers the fairness of the process as a whole, while *Strickland*'s prejudice prong focuses on whether attorney insufficient performance was outcome-determinative. *Id.* at 69. Rosario contends that this potential divergence

between the Sixth Amendment of the U.S. Constitution and New York's ineffective assistance standard resulted in a decision contrary to *Strickland*, pursuant to 28 U.S.C. § 2254 (d)(1).

While *Henry* may or may not portend an eventual differentiation between *Strickland* and New York's ineffectiveness standard, the R & R correctly noted that both *Henry*, 409 F.3d at 70, and *Eze*, 321 F.3d at 123-24, held that in absence of a contradictory holding by either the Supreme Court of the United States or the Second Circuit sitting *en banc*, the courts of this Circuit remain bound by the holding of *Lindstadt*, which concluded that the New York standard does not run afoul of *Strickland*. *See* 239 F.3d at 198. Justice Davidowitz also held that the jury's guilty verdict was supported by the trial record, a consideration consistent with *Strickland*'s prejudice prong. *Strickland*, 466 U.S. at 696. Thus, as the R & R properly observed, the state court believed that the prosecution's case was sufficiently strong that the trial outcome would have been the same, even if additional alibi evidence had been offered. (R & R at 62.)

Second, I conclude that the state court decision was not an "unreasonable application" of *Strickland*. Under the "unreasonable application" prong of Section 2254(d)(1), a federal court may grant relief when a state court "'correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of a particular case.'" *Harris v. Kuhlmann*, 346 F.3d 330, 344 (2d Cir. 2003) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). Though the terminology employed by the state court varies from *Strickland*,[2] I cannot conclude that it amounted to an

---

[2] For example, as Rosario points out in his objections to the R & R, the state court's opinion noted the diligence and integrity of counsel in matters of representation unrelated to the alibi defense. (Petitioner's Objections to the R & R at 13-14.) While such considerations would not arise under a *Strickland* analysis, their presence in the state court opinion does not, in itself, render the state court's analysis unreasonable

unreasonable application of federal law.  28 U.S.C. § 2254 (d)(1).  Justice Davidowitz concluded that the performance of Rosario's counsel was not objectively unreasonable, and that the reliability of the trial's outcome of the jury trial was not jeopardized by the performance of his legal counsel.  He noted that "most importantly, a credible alibi defense was presented to the jury."  (Miller Dec. 62 at 17.)  He concluded that John Torres and Chenoa Ruiz were strong alibi witnesses because their memory of the defendant's presence in Florida was related to the birth date of their son.  (Miller Dec. Ex. 62 at 18-19.)  He also noted inconsistencies presented in the testimony of Fernando Torres.  (Miller Dec. Ex. 62 at 19.)  Though not delivered in *Strickland* terminology, the state court opinion ruled that 1.) Rosario was effectively represented in his alibi defense, and 2.) that his representation did not undermine confidence in the jury's verdict.

A cold reading of the testimony at the 440.10 hearing does not point to only one clear conclusion concerning the possible impact of calling Chenoa Ruiz and Fernando Torres at trial.  Yet the record does not support the conclusion that the state court's fact-finding was objectively unreasonable.  A state court's findings of fact are presumed to be correct, and can be rebutted only by clear and convincing evidence produced by the petitioner.  *Lynn*, 443 F.3d at 246-47.  A district court is not free to engage in *de novo* review of state-court fact-finding.  *Price v. Vincent*, 538 U.S. 634, 638-39 (2003).

Justice Davidowitz considered testimony from ten witnesses, recorded in more than 750 pages of hearing transcripts.  (Miller Dec. Ex. 61.)  His opinion included firsthand observations as to witness credibility and the comparative persuasiveness of the

under 2254(d)(1).  To conclude otherwise would be a failure to apply *Eze*, 321 F.3d at 123-24, and *Lindstandt*, 239 F.3d at 198.

various witnesses presented, and, while not employing the terminology commonly used in a *Strickland* analysis, nevertheless found that 1.) counsel's handling of the alibi defense was not ineffective, and 2.) counsel's performance did not undermine the reliability of the trial's outcome.  In light of Justice Davidowitz's opinion and the record before me, I cannot hold that this conclusion was an unreasonable application of *Strickland*.

I therefore adopt the R & R's recommendation that Rosario's ineffective assistance claim be dismissed.[3]

II.     The R & R is Modified as to Petitioner's *Batson* Claim, Which is Dismissed

Jury selection in Rosario's trial occurred in three rounds.  It is undisputed that, before the second round concluded, the prosecutor exercised six peremptory strikes, and that all six were exercised against African-American members of the jury pool.  Petitioner then raised an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and the following exchange occurred:

> MR. KAISER:  Judge, most respectfully, and I hate to do it, but it's reached the point now where I notice a pattern of challenges that are consistent only by one factor and that's the race of the person that's being challenged, all of whom are black.  Every single one of them.
>
> Now, granted this is the Bronx and there's a lot of black jurors and there's a couple or few that she didn't take off, but the ones that she did take off without exception are Afro Americans.
>
> THE COURT:  Let's see if there is a pattern.

---

[3] The R & R evaluated whether Rosario's representation satisfied both *Strickland* prongs.  (R & R at 42-56.)  It concluded that it did not.  However, as the R & R correctly recognized, a petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly."  *Bell*, 535 U.S. at 698-99.  Rather, in order to grant habeas relief, *Strickland* must be applied objectively unreasonable manner.  *Id.*  The state court's ruling was not objectively unreasonable, and survives scrutiny under AEDPA.

(Whereupon, there is a brief pause in the proceedings.)

THE COURT: I do not see a prima facie case of exercised peremptory challenges by race. The People have exercised six peremptories of Afro Americans and there were four that were not challenged by her, three of whom are jurors, one of them whom you challenged. I deny your challenge.

(Miller Dec. Ex. 65 at 161-62.) The court then corrected itself and stated that five African-American veniremembers went unchallenged by the prosecutor, not four. (Miller Dec. Ex. 65 at 163.) Jury selection resumed. The prosecution exercised five additional peremptory strikes, including one of an alternate juror. (Miller Dec. Ex. 65 at 164, Ex. 66 at 85-88.) Petitioner raised no additional *Batson* objection, and the race of the five additional challenged veniremembers is not reflected in the record.

In his direct appeal to the Appellate Division, First Department, Rosario asserted that because the prosecution exercised all of its first six peremptory strikes against African-American veniremembers, he established a *prima facie* case of discrimination under *Batson*, and that the prosecution should have then been compelled to set forth race-neutral explanations for its challenges. The Appellate Division rejected the argument. *People v. Rosario*, 288 A.D.2d at 143. I adopt the Magistrate Judge's conclusion that the petitioner exhausted his *Batson* claim in state court.

To guard against the discriminatory exercise of peremptory strikes in violation of the Equal Protection Clause of the Fourteenth Amendment, *Batson* and its progeny set forth a three-step framework for evaluating such a claim. First, the party challenging the strikes must establish a prima facie case that its adversary's challenges are race-based. *Batson*, 476 U.S. at 96-97. Once a prima facie case is made, the party exercising the strikes must provide a race-neutral explanation for its peremptory

18

challenges. *Id.* at 97-98. The court must then determine whether the challenging party has established that the challenges were race-based. *Id.* at 96, 98.

The threshold for establishing a prima facie case merely requires "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). A trial court weighing the existence of a prima facie case looks to all relevant circumstances, including numerical patterns and the questions and answers offered during the voir dire. *Batson*, 476 U.S. at 96-97. A *Batson* challenge brought via habeas petition must defeat the "presumption of correctness" afforded to the trial court's first-hand observation of the events in voir dire. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001). "[I]t is one thing to conclude that a pattern of strikes is *prima facie* evidence of discrimination; it is a very different thing to hold that the contrary conclusion would be an unreasonable application of *Batson*." *Sorto v. Herbert*, 497 F.3d 163, 174 (2d Cir. 2007). Because the habeas petitioner bears the burden of demonstrating a violation of constitutional rights, if a deficiency in the record makes it impossible to ascertain the existence of discriminatory conduct, the petitioner's claims must be rejected. *Id*. at 172-73. The Second Circuit also has observed that while the burden of showing a prima facie case is not onerous, it safeguards "the traditional confidentiality of a lawyer's reason for peremptory strikes unless good reason is adduced to invade it . . . ." *Id.* at 170 (citing *Miller-El v. Dretke*, 545 U.S. 231 (2005)).

The R & R concluded that the state trial court unreasonably applied federal law in ruling that Rosario failed to establish a prima facie case under *Batson* and recommended that the habeas petition be conditionally granted as to its *Batson* claim. (R & R at 69-82.) It reasoned that "[t]he prosecutor's disproportionate strikes of black

jurors, despite the fact that not all blacks were stricken from the jury, was sufficient to raise an inference of discrimination and, therefore, sufficient to establish a *prima facie* case under *Batson*." (R & R at 82.) In reaching this conclusion, the R & R relied on *United States v. Alvarado*, 923 F.2d 253 (2d Cir. 1991), and emphasized that at the time Rosario raised his *Batson* objection, six of six peremptories were brought against African-American veniremembers. (R & R at 74-78.)

The Second Circuit often has noted the perils of using a snapshot in time amid an incomplete voir dire when reviewing a *Batson* objection raised in a habeas petition. To ascertain the existence of a prima facie case, "[t]he discharge of this burden may entail a review of prosecutorial strikes over the span of the selection process." *Sorto*, 497 F.3d at 170. This is because, in part, "[t]he need to examine statistical disparities may commend a wait-and-see approach," and because "an early *Batson* challenge limits the state court's ability to properly assess a prima facie case." *Id.*

In *Overton v. Newton*, 295 F.3d 270, 279 (2d Cir. 2002), a *Batson* objection arose partway through voir dire. At the time of the objection, the prosecutor had exercised seven peremptory strikes against African-American veniremembers, whereas three African Americans had been seated as jurors and one African-American veniremember had been struck for cause. *Id.* The state trial court ruled that the petitioner failed to establish a prima facie case. *Id.* The Second Circuit held that because the statistics-based *Batson* objection arose partway through jury selection, it was not unreasonable for the trial court to deny the motion. *Id. Overton* explained the complications of granting habeas relief pursuant to a statistics-based *Batson* objection arising before jury selection completes:

> [T]he trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection. If those statistics sufficiently established the inference that challenges were based on race, the court could then have implemented the *Batson* process to ensure that impermissible challenges would not be allowed. If, on the other hand, the statistics at the conclusion failed to support a sufficient inference, there would be no need to engage in the process. We cannot say, on this record, that the trial judge's refusal to implement *Batson*'s process for testing each questioned challenge midway in the process was an unreasonable application of the *Batson* requirements.

*Id.* at 279-80. *Overton* noted that this caution is particularly warranted when reviewing a state court's *Batson* determinations pursuant to a habeas petition. *Id.* at 280 n.12. In *Williams v. Burge*, 2005 WL 2429445, at *4-6 (S.D.N.Y. Oct. 3, 2005), *aff'd*, 257 Fed. Appx. 337 (2d Cir. 2007) (table), this Court applied *Overton* and held that it was not objectively unreasonable for a state trial court to find no *prima facie* case when a *Batson* objection arose partway through jury selection. Similarly, in *Sorto*, the Second Circuit held that a state court acted reasonably when it denied as premature a *Batson* challenge "after only three peremptory strikes." 497 F.3d at 171.

Subsequent to the R & R in this case, the Second Circuit again affirmed dismissal of a habeas petition raising a statistics-based *Batson* objection prior to the conclusion of jury selection:

> [H]ere, petitioner's *Batson* challenge was denied as premature, she failed to renew the motion, and the status of jury selection at the time of the challenge did not insure that the statistics would establish a *prima facie* case irrespective of what happened during the jury selection process thereafter.

*Brown v. Alexander*, ___ F.3d ___, 2008 WL 4287864, at *7 (2d Cir. Sept. 22, 2008). In *Brown*, the defendant's trial counsel argued partway through jury selection that the prosecutor exercised its peremptory strikes in a discriminatory fashion when seven of eight peremptory strikes were used against African-American veniremembers. *Id.* at *2,

*2 n.2.  The trial court denied the *Batson* challenge, which was never renewed by trial counsel.  *Id.* at **2-3.  The Second Circuit held that the trial court's ruling was not unreasonable.  *Id.* at **7-8.  In so holding, *Brown* underscored the holdings of *Overton* and *Sorto*, and further illuminated the perils posed to a habeas court reviewing a *Batson* challenge "lodged relatively early in the jury selection process.  *Id.* at *6.  Of course, because *Brown* post-dates the R & R, it was issued without the benefit of *Brown*'s holding and analysis, which makes clear that in many situations, a trial court's "'wait-and-see' approach" is not an unreasonable application of *Batson*.

     As in *Overton*, *Sorto* and *Brown*, the record of jury selection here precludes me from holding that the trial court's ruling was unreasonable.  In this instance, the reliance on *United States v. Alvarado*, 923 F.2d 253 (2d Cir. 1991), is misplaced.  *Alvarado*, which was reviewed under a direct appeal, holds that a defendant successfully establishes a prima facie case under *Batson* when there is significant statistical disparity between the prosecution's challenge rate against minorities and the overall minority composition of the venire.  *Id.* at 255.  As pointed out by the respondent in his objections to the R & R, *Alvarado*'s statistical analysis accounted for minority venirepersons who went unchallenged by the prosecutor, and looked to the overall rate of minority-directed challenges in light of those who were unchallenged.  In its statistical analysis, *Alvarado* noted that "the prosecution challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates."  *Id.* at 255. [4]

---

[4] *Alvarado*'s statistical breakdown is brief and somewhat cryptic, so it is worthwhile to point out the statistical analysis of its predecessor opinion, *U.S. v. Alvarado*, 891 F.2d 439, 444 (2d Cir. 1989), *vacated on other grounds*, 497 U.S. 543 (1990) (per curiam).  *Alvarado I* explicitly rejected the argument that the relevant strike rate looks to the percentage of peremptories directed at minorities (in that case, four

It is true that at the time petitioner raised his *Batson* objection, six of six peremptory strikes had been exercised against African-American veniremembers, while five other African Americans from the pool were unchallenged by the prosecution. (Miller Dec. Ex. 65 at 161-63.)  Thus, under *Alvarado*, the relevant focus is that six of 11 – or slightly less than 55 percent –African-American veniremembers were challenged, not that 100 percent of peremptory challenges were brought against African-American veniremembers.  The transcript of jury selection indicates that at the time of the *Batson* objection, there were 11 African-American veniremembers in a pool of 21 potential jurors, excluding those potential jurors removed on consent.  (Miller Dec. Ex. 65 at, 88, 90-92, 94, 100-02, 156-63.)  Thus, it appears from the transcript that at the time of the *Batson* objection, African Americans were 52 percent of the jury pool, and challenged at a rate of 55 percent.  As the respondent argues, this challenge rate is not a significant variant from the overall percentage of African-American veniremembers, and is insufficient to establish a prima facie case under *Batson*.  *See generally Harrison v. Ricks*, 326 F. Supp. 2d 372, 378-79 (E.D.N.Y. 2004), *aff'd* 150 Fed. Appx. 95 (2d Cir. 2005) (table); *Barbara v. Goord*, 98 Civ. 4569, 2001 WL 1776159, at *3 n.2 (Dec. 27, 2001) (Raggi, J.) (pursuant to *Alvarado*, "a prosecutor's percentage of minority challenges should be calculated by considering waived as well as exercised challenges."); *but see Truesdale v. Sabourin*, 427 F. Supp. 2d 451, 461 (S.D.N.Y. 2006) (emphasizing that 100 percent of peremptory challenges were exercised against minority veniremembers).

---

minority-striking peremptories out of six peremptories used) as opposed to considering challenges in light of those waived (in that case, four minorities peremptorily struck out of seven minorities in the jury pool). *Id.*  The statistical approach of *Alvarado I* was employed by its successor upon remand, without reference to the rejected approach.  923 F.2d at 255.

I also note that in *Alvarado*, the Second Circuit heard a direct appeal from a federal criminal case, and was not considering a habeas petition pursuant to Section 2254. 923 F.2d at 254. The deference required under AEDPA is not equivalent to the scrutiny of an appellate court exercising direct review. *See*, *e.g.*, *Overton*, 295 F.3d at 280 n.12 ("Our ruling in this case is governed by the deferential standard prescribed by AEDPA for *habeas* review by a federal court of a state court determination. We, therefore, do not address the question that would arise if this were a direct appeal from a federal criminal trial on the same facts and make no suggestion as to how such a case should be decided."); *see also Galarza*, 252 F.3d at 635 ("[W]hen reviewing a *Batson* challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness . . . .").

I conclude that the trial court was not unreasonable in ruling that petitioner failed to establish a prima facie case showing discriminatory exercise of peremptory strikes, and that the petition's claim for relief on *Batson* grounds is denied. The R & R is modified accordingly.

III.   The R & R Correctly Concluded that Rosario's Constitutional Rights Were Not Violated by the Testimony of the Prosecution's Rebuttal Witness

Rosario contends that he was denied his Fourteenth Amendment right to due process because the trial court allowed, over counsel's objection, the testimony of the prosecution's rebuttal witness, Captain Bruce Bolton, the records custodian of the Department of Corrections in Volusia County, Florida. (Petition, Ground Three.) Bolton

testified that Rosario was in Department custody from March 13, 1996, through April 12, 1996.  (Trial Tr. at 451.)

First, I adopt the R & R's conclusion that Rosario exhausted this claim in the state courts.  Consistent with *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), Rosario alerted the Appellate Division of his contention that he was denied due process under the Fourteenth Amendment, and incorporated that contention in his submission to the New York Court of Appeals.  (Appellate Division Brief at I, attached at Blira-Koessler Aff. Ex. 1; R & R at 86-89.)  The Appellate Division ruled on the merits of this claim.  *People v. Rosario*, 288 A.D.2d at 142-43.  The respondent's contention that this claim is unexhausted lacks merit.

Second, I adopt the R & R's conclusion that Bolton's testimony did not violate the Fourteenth Amendment.  As noted by the R & R, evidentiary rulings, even erroneous ones, rarely rise to the level of a constitutional violation.  *See*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991).  Habeas relief can be granted only if improperly admitted evidence is so unfair that it violates fundamental concepts of justice.  *See*, *e.g.*, *Dowling v. United States*, 493 U.S. 342, 352 (1990).  The erroneous evidence must have provided the basis for conviction, or else the evidence must be so integral that without it, reasonable doubt would have existed.  *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998).

Rosario's testimony opened the door for impeachment evidence concerning his whereabouts during March and April, 1996.  He testified that he was in Florida until mid-April because he was "having a good time" and "enjoying being out there."  (Trial Tr. at 384.)  He stated that during this time, he "was staying in a girl's

house I met over there," and resided with her from February through mid-April 1996. (Trial Tr. at 382, 394-95.) Bolton's testimony was introduced for the purpose of impeaching Rosario's factual statements. As noted in the R & R, when a defendant provides testimony as to a specific fact, the prosecutor may offer impeachment testimony showing that the defendant's testimony was untruthful. *United States v. Beno*, 324 F.2d 582, 588 (2d Cir. 1963), *cert. denied*, 379 U.S. 880 (1964). Even if the issue is a collateral one, a witness is not permitted to benefit from "a gratuitously offered statement." *Id.*

Rosario also contends that the rebuttal evidence prompted the jury to conclude that he had a propensity toward criminal conduct, and that the resulting prejudice violated his due process rights. The trial judge, however, issued a limiting instruction directed toward Bolton's testimony:

> The defendant's incarceration in Florida is not evidence of the defendant's guilt in this case nor evidence that the defendant is the person who was disposed to commit crimes. You should consider such testimony only in determining the credibility of witnesses who have appeared before you. You should not consider his testimony for any other purpose.

(Trial Tr. at 565.) Jurors are presumed to follow instructions, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), including limiting instructions. *United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006). The risk of prejudice is most likely to outweigh the power of a limiting instruction in instances when impeachment testimony includes a crime similar to the one for which the defendant is on trial. *See, e.g., United States v. Puco*, 453 F.2d 539, 542 (2d Cir. 1971). However, in this instance, the trial judge did not specify the crime for which Rosario was incarcerated, and it is unlikely that a juror would infer from the

brief period of imprisonment that Rosario had been convicted of murder or a similarly serious offense.

I adopt Magistrate Judge Pitman's recommendation that Rosario's due process claim should be denied.

IV.    The R & R Correctly Concluded that Rosario's Actual Innocence Claim Should Be Dismissed

Rosario asserts that his habeas petition should be granted on grounds of actual innocence.  (Petition, Ground Two.)  He contends that relief on grounds of actual innocence is appropriate because nine witnesses have provided exculpatory testimony placing him in Florida at or around the date of Collazo's murder, and because he was convicted on the basis of eyewitness testimony.  (*Id.*)

Actual innocence may excuse a procedural default, and may arguably provide a basis not to apply the statute of limitations imposed by AEDPA.  *Doe v. Meneffee*, 391 F.3d 147, 161 (2d Cir. 2004); *Whitley v. Senkowski*, 317 F.3d 223, 225-26 (2d Cir. 2003).  Neither the Supreme Court nor the Second Circuit has recognized a freestanding claim of actual innocence as a basis for habeas relief.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *United States v. Quinones*, 313 F.3d 49, 67 (2d Cir. 2002) (citing *Herrera* and noting that actual innocence has not been held to provide an independent basis for habeas relief).  Nevertheless, for the purpose of this petition, I will generously assume that such a basis for relief exists.

As the R & R notes, a successful claim for actual innocence requires the petitioner to come forth with new and reliable evidence making it more likely than not that no reasonable juror presented with that evidence would have convicted the petitioner. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). A reviewing court must evaluate the actual innocence claim in light of the entire record, including evidence that may have been inadmissible. *Id.* at 162; *Doe*, 391 F.3d at 161.

In concluding that the actual innocence assertion should be rejected, the R & R noted that, even if additional alibi testimony had been admitted, Rosario's acknowledgement that he often traveled between New York and Florida might prompt a reasonable juror to conclude that Rosario was present in New York in mid-June. (R & R at 103.) It noted that the prosecution's two eyewitnesses expressed great confidence that Rosario was the shooter, and that their testimony was unimpeached at trial. (R & R at 103.) The alibi witnesses all risked impeachment on grounds that they were friends of Rosario, the R & R noted. (R & R at 103.) I cannot conclude that no reasonable juror would have been persuaded by the prosecution's case, *see Bousley v. United States*, 523 U.S. 614, 623 (1998), in what would have been, at heart, a credibility contest.

In addition, as the R & R notes, an actual innocence claim considers "whether the new evidence on which the actual innocence claim is based is reliable." *Doe*, 391 F.3d at 165. The R & R notes that, for example, witnesses at the 440.10 hearing had contradictory recollections as to Jenine Seda's whereabouts on June 19, 1996. Such contradictions would lead to further questions about the reliability of the memories of the alibi witnesses and their placement of Rosario at a certain time and place. Given the passage of time, witness memories inevitably fade. Perhaps a jury

would fully credit Rosario's alibi witnesses, or perhaps they would not. In either event, the alibi testimony is not so ironclad in its reliability that it satisfies the criteria for actual innocence.

I adopt in full Magistrate Judge Pitman's recommendation that the actual innocence claim be dismissed.

Conclusion

The R & R is modified to the extent that it recommends granting the petitioner relief on his *Batson* claim. It is adopted in all other respects. The petition is dismissed.

Petitioner has not made a substantial showing of the denial of a constitutional right, and, accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       October 22, 2008